**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **K.S., et al.,** ) | **CASE NO.  1:13 CV 91** |
| ) | |
| **Plaintiffs-Appellants,** ) | |
| ) | |
| **v.** ) | **JUDGE DONALD C. NUGENT** |
| ) | |
| **STRONGSVILLE CITY** ) | |
| **SCHOOL DISTRICT,** ) | |
| ) | |
| **Defendant-Appellee.** ) | **MEMORANDUM OPINION** |

This matter is before the Court on the Motion for Judgment on the Administrative Record (Docket #21) filed by Plaintiffs-Appellants, K.S., et al. ("Plaintiffs").  Plaintiffs assert that Defendant-Appellee, Strongsville City School District ("the School District") denied N.S. ("the Student") a free and appropriate public education ("FAPE") for the 2009-10 and 2011-12 school years and ask the Court to overturn the May 23, 2012 decision of Impartial Hearing Officer, Harry Taich, Esq. ("IHO"), and the October 18, 2012 decision of the State Level Review Officer, Robert L. Mues, Esq. ("SLRO"), both of whom determined that the Student was not denied a FAPE for the 2009-10 and 2011-12 school years and denied Plaintiffs' request for tuition reimbursement.

**Factual and Procedural Background**

On December 16, 2011, Plaintiffs initiated an administrative due process hearing request, pursuant to Section 1415(f)(1) of the Individuals with Disabilities Education Improvement Act ("IDEA"),[1] alleging the School District failed to offer the Student a FAPE for the 2009-2010 and

---

[1]

Plaintiffs refer either to the Individuals with Disabilities Improvement Act or

2011-2012 school years.  The case was assigned Number SE2645-2011 and Harry Taich, Esq. was appointed by the Ohio Department of Education, Office of Exceptional Children, to serve as the Impartial Hearing Officer ("IHO").

A hearing commenced on February 6, 2012 and continued for a total of 12 non-consecutive days, ending on March 30, 2012.  Testimony was given by 31 witnesses.  On May 23, 2012, IHO Taich issued his final decision, including 27 pages of Factual Findings, with specific citations to the Transcript and/or Exhibits.

The Court has reviewed the decision of the IHO in detail, and cross-referenced his decision with the Record.  The Court hereby adopts the Factual Findings of the IHO, set forth below, as they accurately reflect the evidence of record.

> The parties are in agreement that Student is currently 9 years old and resides in the District. (Tr. 1647, Ex. J-1) The parties additionally agree that Student meets the criteria under the educational classification of autism. (Ex. J-39)

> "Autism" is defined as a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change, or change in daily routines, and unusual responses to sensory experiences.  34 C.F.R. § 300.8 (c)(l)(i)

> Student is currently enrolled at Monarch School (hereinafter "Private School") as of November, 2011. (Tr. 1414)  This Private School serves only children with Autism. (Tr. 1429, 1448, 1458) Private School does not have any typically developing peers attending the school.  (Tr. 1429, 1448, 1458, 1554)

---

IDEIA, and Appellee refers to the Individuals with Disabilities Education Improvement Act or IDEA.  The Individuals with Disabilities Education Improvement Act, the IDEIA, amended the IDEA, was enacted in 2004 and took effect on July 1, 2005. *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 506 n.2 (2d Cir. 2006).  However, the amended act itself continues to state that it may be cited as the "Individuals with Disabilities Education Act," 20 U.S.C. § 1400(a). The Court has previously referenced the Act as the IDEA and references herein will be to the IDEA, as amended.

Student has been diagnosed with Pervasive Developmental Disorder, not otherwise specified (PDD, NOS), ADHD, Combined Type, congenital left ear anomaly resulting in a physical deformity of the left ear with moderate mixed hearing loss in the left ear. (Tr. 1647- 1649, Ex. J-41 at Pg. 361)[2]  Student was previously prescribed Vyvance 20mg for his ADHD symptoms, which he had been taking since December 2010.  (Tr. 1802, Ex. J-41)  Parent previously advised the District that the medicine helped in slowing Student's impulsivity and activity level which helped to calm him.  (Ex. J-41 pg 361)

However, during October 2011, the Vyvance prescription was discontinued due to side effects related to sleeping and eating, and his appetite has since improved.  (Tr. 1802-1803, Ex. J-41, page 361)

In May, 2005, Student was initially evaluated by District and identified as a Student eligible for special education services under IDEIA. (Tr. 1703, Ex. J-41) He qualified as a preschool student with a disability due to developmental delays in the areas of communication, social emotional functioning, adaptive behavior, and fine motor skills. (Ex. J-41) Student attended Strongsville  Early Learning Preschool through December, 2005, and received services.  (Tr. 1701-1702, Ex. J-41)

In January, 2006, Student qualified for the Autism Scholarship Program ("ASP") and Student was placed by his Parents at the Middleburg Early Education Center ("MEEC").  (Tr. 1705-1706, Ex. J-41)  During May, 2006, per Parent request, the District conducted a physical therapy evaluation and the team determined that Student did not qualify in the area of gross motor skills.  (Ex. J-41, Pg. 361)  No new areas of deficit, however, were found to exist. (Ex. J- 41, at Pg. 361)  Student attended MEEC for the rest of the 2005-2006 school year, as well as the next two years, until May, 2008.  (Tr. 1703)

A school age evaluation of Student was completed on April 8, 2008, and he was identified and determined to be eligible for special education and related services under IDEIA as a student with Autism.  (Ex. J-34, J-41)  The evaluation team meeting on April 8, 2008, determined and Parent agreed that Student needed services in speech and language therapy, occupational therapy, initiate interaction with others and increase social interaction with others.  He needed to improve his participation in class activities, independent work skills, and attention and focus in the classroom setting.  (Ex. J-34)

Student was placed in the general education classroom for kindergarten

---

[2]
    In their Complaint, Plaintiffs also reference the fact that the Student demonstrates insufficient lip closure that results in difficulty with being understood and has inadequate vocal volume which also makes his speech unintelligible.  (Plaintiffs' Complaint at Paragraph 16.)

with supports. (Tr. 1650, 1707, Ex. J-42)  Student attended Whitney Elementary for the entire 2008-2009 kindergarten year and made adequate progress. (Tr. 415-416)  Student participated in the general education kindergarten classroom for the entire 2 and ½ hour a.m. session.  (Tr. 416, Ex. J-42)  At the conclusion of the kindergarten day, he received direct instruction from an intervention specialist during extended time in the Special Class Learning Center ("SCLC").  (Tr. 416, Ex. J-42)  Student also received occupational therapy, speech and language therapy, and zoned special education aide support in the kindergarten general education setting.  (Ex. J-42 at Pg. 427)  According to Student's occupational therapist, Parent did not want Student removed from the general education classroom for sensory breaks to calm him down during his kindergarten year  (Tr. 571)  The occupational therapist testified  that in her opinion, it would have been more beneficial for Student to be removed from the regular education classroom for behavioral sensory breaks during his kindergarten and early first grade year.  (Tr. 571, 668-669)  Mother wanted Student to keep up with the same standards as the other students.  (Tr. 1657)  Parent disputes the claim that District team members had recommended small class learning center for the 2009-2010 school year, but District accommodated Parent's request by reaching consensus and placed him in the general education classroom for first grade.  (Tr. 1654-1655, 1313-1314)  During the 2009-2010 school year, Student did better with sensory breaks outside of the classroom, according to the occupational therapist's testimony.  (Tr. 573-574)[3]

The 2009-2010 School Year:

Student's IEP team met on May 19, 2009, to develop his 2009-2010 school year IEP, utilizing the April 8, 2008 MFE of Student.  (Tr.  1709-1710, Ex. J-42)  The IEP team consisted of the Parent, Speech Language Pathologist, Intervention Specialist, Regular Classroom Teacher, School Psychologist, Advocate for Parent, Special Educational Coordinator, and Occupational Therapist.  (Tr. 428, Ex. J-42)  Parent participated in the face to face IEP meeting with all of the other participants, but did not mark the box agreeing to same above her signature.  (Ex. J-42, Pg. 457)  However, Parent testified that her signature was her agreement with the IEP and she gave her consent to its implementation.  (Tr. 1710)  Parent reported on the sensory profile that student has difficulty functioning when there is a great deal of noise in his environment.   (Ex. J-42)

Student's 2009-2010 educational needs were identified on his IEP in the areas of receptive and expressive communication, social interaction skills, independent work skills, participation in class activities, following classroom

---

[3]

In their Complaint, Plaintiffs state that the Student made adequate progress in the regular education classroom during his Kindergarten year, without any adverse behaviors that required removing him from the classroom or his peers.  (Complaint at Paragraph 22; Transcript at p. 1912.)

routines, sustain attention in the classroom, and having opportunities to  practice self-help skills and prerequisite hand skills necessary for writing.  (Ex. J-42)  The 2009-2010 IEP contained measurable goals and objectives targeted to his needs in the above areas.  (Ex. J-42)  Student also received occupational therapy, speech and language therapy, and zoned special education aide support in the general education setting.  (Ex. J-42)  The zoned special education aide support turned out to be a 1:1 aide for the Student for the entire 2009-2010 school year in the general education classroom.  (Tr. 100-101, 214-215, 219-222)[4]

A Functional Behavioral Assessment (FBA) was completed by Lindsay Arndt, school psychologist, on 02/2/2009, during Student's Kindergarten year which was considered in his IEP for his first grade year.  (Ex.  J-42, at Pg. 433) Student's giggling and silly behaviors occurred more often after long periods of sustained attention for work or during wait times or transitions.  (Ex. J-42 at Pg. 433)  When sensory or movement breaks were  provided,  Student appeared calmer and was subsequently able to sit appropriately and engage in the activity. (Ex. J-42 at Pg. 433)  Student's behavior appeared to be an attempt to gain attention from adults.  (Ex. J-42)  The IEP team considered increased opportunities for sensory activities or movement breaks between tasks that required sustained attention.  (Ex. JA2)  The team determined that Student may benefit from having a predetermined sensory schedule to ensure the appropriate amount of movement is built into his day.  (Tr. 572-573, Ex. J-42)  Student's 2009-2010 IEP included 45 minutes of occupational therapy direct services per week with 30 minutes in a one-on-one setting within a therapy room and 15 minutes in the general education classroom.  (Tr. 620, Ex. J-42)  Parent did not want Student removed from his core academics, which included language arts, math, science and social studies during his school day.  (Tr. 620-621, 668, 1277; Ex. J. 42)  Student would also receive 240 minutes per month of speech and language therapy during  the 2009-2010  school year.  (Ex. J-42 at Pg. 443)  He would receive 120 minutes a month of direct individual therapy and 120 minutes a month of direct small group therapy within the speech  room, SCLC, or general education classroom, but he was not to be removed  from his core academics. (Ex. J-42 at Pg. 443)  Student's first grade regular education teacher testified that he spent 85-90% of the time, other than specials, for the entire school year in her room during the school day.  (Tr.  107, 173)  She further stated that art, music, gym, occupational therapy, and some sensory breaks were not in her room.  (Tr. 103)  The first grade regular education teacher also testified that Student used the "glass house" as a quiet place to work close to her classroom.  (Tr. 109-111, 114-115)  She stated that he needed a quiet place to do work.  (Tr. 109-111)  The "glass house" was like a vestibule area or foyer between the outside door and

---

[4]

In their Complaint, Plaintiffs assert that the 2009-10 IEP did not provide appropriate supports to address the Student's needs.  (Complaint at Paragraph 24.)

inside door of school. (Tr. 109-112, 187, 414; Exs. P-K, P-L, P-M)[5] She further testified that many meetings took place during the beginning of the 2009-2010 school year with regard to Student's behaviors of running, laughing out, spitting and that she participated in an amended behavioral goal for his IEP (Ex.46 at pg. 629, Tr. 118-120) Student's special education aide handled Student's breaks and that in the regular education teacher's opinion, Student completed all of his work. (Tr. 105,123) Student's first grade regular education teacher testified that Mother never observed her son at school in teacher's classroom during the 2009-2010 school year. (Tr. 193) In Teacher's opinion, the Student did very well and he could handle first grade curriculum. (Tr. 124) The intervention specialist testified that many times the amount of work was cut down, but overall learning principles were not compromised. (Tr. 480) For example, the general education teacher might assign 5 math problems on one educational point and Student would complete two of the problems. (Tr. 480) Student's IEP permitted this modified work schedule for him. (Ex. J-46 at pg. 624; Tr. 481-482) Student's grades for his first grade year were mostly S and S+ and regular education teacher testified that he was a good student. (Tr. 124,197; Ex. J-116) Teacher further testified to my questions, that in her opinion, as follows: (a) he needed an aide for his behaviors; (b) she enjoyed having him in class; (c) other children got along with him; (d) he had a good friend in class; and (e) she promoted him to second grade because he could handle the work. (Tr. 204-207)

The occupational therapist testified that Mother did not want Student to be taken out of the classroom at the beginning of the first grade year for sensory breaks. (Tr. 567-568, 571,669) Scheduling allowed for more sensory breaks at end of the year for Student outside of the classroom. (Tr. 566-567) Parent requested sensory breaks be in the classroom at the beginning of the first grade year. (Tr. 571, 573, 669) Everyone on the team believed student would benefit more from being removed from the classroom for sensory breaks except mom, according to the testimony of the occupational therapist. (Tr. 571-572, 668) The team believed that Student was overwhelmed in the classroom or needed a break outside of the room to access more equipment for his sensory breaks. (Tr. 572) These breaks were discussed at the IEP meetings for kindergarten and first grade years, but Parent wanted breaks inside the classroom so Student would not miss time from the regular education room. (Tr. 571-572, 668, 1277-1278) The occupational therapist further testified that after the FBA in November, 2009, more breaks took place outside of the classroom. (Tr. 570-576, 668) In her opinion, the outside breaks were very successful for Student and they lasted as scheduled 5-10 minutes, two to three times per day. (Tr. 575)

Student's behavior problems increased in the second half of the 2009-2010 school year. (Tr. 576) Between the two FBA's (November thru May) that the

---

[5] Plaintiffs state that in response to the Student's increasing behaviors, the Student was secluded in a glass breezeway in the building, without their knowledge. (Complaint at Paragraphs 28-30; Transcript at pp. 266 and 1678.)

District performed on Student, there were behavioral interventions and sensory breaks utilized throughout the day. (Tr. 578-579) District staff utilized proactive strategies to address Student's increased behaviors, such as social stories, visual schedule, picture cues and increased computer use. (Tr. 576-577) Student was more successful working in a quiet area outside the classroom. (Tr. 579-580) The occupational therapist, per student's IEP, provided an extra 30 minutes for consultation services on a monthly basis, which included extra time for observations to work on sensory plans with general education and/or special education staff. (Tr. 625) In therapist's opinion, Student lacked the ability to request when he needed a break, and a new goal #8 was added to his IEP on November 10, 2009, to work on this goal. (Tr. 628; Ex. J-46, pgs 629-630)[6]

The 2009-2010 IEP contained measurable goals and objectives to meet Student 's individual needs in the areas of expressive and receptive language skills, behavioral problems, social and emotional functioning, gross motor skills, vocabulary, sensory needs and communication. (Ex. J-42) Many of the IEP goals and objectives dealt with Student's skills involving tying his shoes, using complete sentences in answering questions, participating in cooperative play for five minutes with his peers, identifying the similarities and differences between two objects or pictures involving shape, size, function and color, utilizing proper letter alignment and writing mechanics, and joining a group during unstructured time with no more than two prompts. (Ex. J-42)

The 2009-2010 addendum to the IEP provided Student with a quiet work and break area and a special education aide assigned to Student full-time to accompany him to his classrooms, to assist him with behavioral interventions, classroom accommodations, and travels by and between the areas of the buildings and grounds. (Tr. 1984-1985; Ex. 47 at Pg. 632) The IEP covered his needs involving preferential seating, modified worksheets, repeated directions, visual supports and schedule, extended time to complete assignments, small group testing and prompts to stay on task. (Ex. J-42) During the summer of the 2009-2010 school year, prior to the start of the 2010-2011 school year, the IEP team determined that Student qualified for extended school year services ("ESY"), but Mother refused and rejected same (Ex. 49)

Student was placed in the general education setting as his LRE for the 2009-2010 school year, but he received some sensory breaks in the Special Class Learning Center. (Tr. 416-417) Student's intervention specialist testified that in her opinion, he was placed in the general education setting because of his very

[6] Plaintiffs state that despite the addition of Goal #8 to the IEP and continued seclusion in the glass house, the Student's behaviors continued to escalate in frequency, duration and content. (Complaint at Paragraph 35; Transcript at pp. 274, 458, 985, and 2051.) Plaintiffs state there was never a behavior intervention plan developed for the Student. (Complaint at Paragraph 36.)

good kindergarten year.  (Tr. 1044-1045) According to the school psychologist there were discussions by IEP team members that felt Student may have been more successful if he spent more time in a small setting with less distractions and less stimulation.  (Tr. 1278)

The District provided Student with the same aide in kindergarten and first grade until she was injured in late March of 2010.  (Tr. 214, 239)  This aide spent pretty much the entire day with Student except for her lunch time. (Tr. 223)  The aide was not considered a one-on-one aide, but she was with him throughout his school day.  (Tr. 989)  The aide assisted with classroom activities, if needed, helped with accommodations or modifications and provided Student with breaks. (Tr. 989)  She was out at recess on the playground within site of the Student during the 2009-2010 school year, but testified that she did not hover all over him.  (Tr. 224)  She spoke with Student's intervention specialist at least once a day about Student and many times twice a day.  (Tr. 434)  Student had many sensory needs and behavioral problems throughout the 2009-2010 school year. (Tr.247, 266)  The aide testified that morning worksheets of 1 hours were lengthy for a first grader and Student had difficulty sitting for that prolonged period of time.  (Tr. 255-256)  Aide would sometimes take Student to glass house for quiet area for him to work on the worksheets.  (Tr. 255-256)

On November 10, 2009, District provided Parent an IEP meeting, per Parent's request, to discuss the results of Student's FBA completed on November 9, 2009.  (Ex. J-46, Pg. 629)  A behavioral goal was added to Student's IEP on November 10, 2009.  (Ex. J-46, pg. 629)  Student's behaviors later in the 2009-2010 year became worse with his laying on the floor, mouthing and licking issues, running down the hall, knocking small things off the desk and cursing in the classroom.  (Tr. 274-275)  Aide believed that longer school day in first grade compared to kindergarten was part of the cause for some of these additional behaviors.  (Tr. 278)  Student ran out of the building several times while the aide was with him, but he would stop and come back into the building.  (Tr. 280) Parent also believed that Student was being bullied, but a one-month investigation by the District failed to substantiate Parent's claim.  (Tr. 532)  Aide testified that she never witnessed anyone picking on Student in gym, part of lunch, and playground, and that Student never came to her to complain about other students picking on him. (Tr. 301, 304)  She witnessed the other students to be very accepting of Student.  (Tr. 327)

The kindergarten and 1st grade aide was injured in late March, 2010, and another aide replaced her as Student's aide for the remainder of the 2009-2010 school year. (Tr. 239, 294, 723-724) This second aide testified that the intervention specialist advised her that Parent wanted Student in the general education program as much as possible.  (Tr. 680, 683)  She testified that school work that Student did not finish would be put in his backpack and sent home for completion.  (Tr. 710) The completed schoolwork was returned the next day and given to the regular education 1st grade teacher. (Tr. 710-711)  This aide's concern was that Student knew what he was doing with regard to the work and

she was not concerned that he completed all of the problems. (Tr. 713) The 2009-2010 IEP provided for Student's work to be modified to a lesser amount. (Ex. J-46, Pg. 624)

Student's intervention specialist for the 2009-2010 school year was the same specialist that provided services to him in 2008-2009. (Tr. 412) She testified that Student did not receive any academic instruction in her room ("SCLC") during the 2009-2010 school year. (Tr. 420, 1044-1045) Several witnesses testified that consistency, structure and routine were extremely important in working with Student. (Tr. 44, 438) The intervention specialist and Mother discussed and worked on Student's escalating behaviors during the 2009-2010 school year, with meetings, strategies and two functional behavioral assessments (FBA) conducted during the school year. (Tr. 53, 56-57, 463-464) In intervention specialist's opinion, Student's behaviors interfered with his education and that he needed more breaks and sensory time out of the regular education classroom. (Tr. 460-461, 464) In her opinion, Student's aides during the 2009-2010 school year did not provide direct instruction to Student. (Tr. 989-990, 1045) The aides helped Student with accommodations and modifications to provide help in completing tasks and activities. (Tr. 989-990, 1045-1046) During the 2009-2010 school year, the IEP team discussed Student's placement in the regular education classroom as his behaviors increased. (Tr. 2050) The team believed that he could do the first grade regular education work with accommodation s and modifications. (Tr. 2050) The IEP team wanted Student to be successful within the general education curriculum or classroom. (Tr. 2050-2051)

District school psychologist completed a functional behavior assessment on Student in November during the 2009-2010 school year. (Tr. 1273; Ex. J-59)[7] The behaviors of concern that were targeted were the giggling, repetitive speech, silly behavior, calling out, verbalizations, leaving the seat, and use of inappropriate objects. (Tr. 1273, Ex. J-59 at Pg. 843) Recommendations from the FBA to address Student's behaviors were to teach him to request a break

---

[7] Plaintiffs state that in the fall of 2009, the Student began to demonstrate aggressive behaviors, which Plaintiffs allege was the result of a lack of specifically designed instruction; peer bullying; lack of proper supports; and, the lack of a behavior intervention plan to support success in the regular education setting. (Complaint at Paragraph 25.) Plaintiffs state that the Student had numerous incidents of spitting; hitting teachers; throwing objects; swearing; and, destroying school property. (Complaint at Paragraph 26.) Plaintiffs state that there were four incidents of elopement during the 2009-2010 school year, during which the Student left the building into the neighborhood. (Complaint at Paragraph 27.) Plaintiffs state that they had "no knowledge of the severity of the impact the Student's behaviors were having on his education in the general education setting during the 2009-2010 school year. (Complaint at Paragraph 32; Transcript at pp. 1680-82 and 1881.)

because he had deficits in the area of communication.  (Tr. 1274)  The school psychologist who completed the FBA determined that Student became over-stimulated in the general education setting and he just needed some time to calm down.  (Tr. 1275)  An IEP meeting was utilized to discuss the FBA findings and an area outside the classroom was used for a break and timeout area from all of the activity in the classroom.  (Tr. 1275)  A behavioral goal was added to Student's IEP as a result of the November, 2009, FBA.  (Tr. 1275-1276; Ex. J-46)

Mother testified that during the 2009-2010 school year, she did not want Student to miss the core curriculum or academic basics to keep up with his classmates in regular education.  (Tr. 1656-1657, 1715)  Parent and her advocate had written for the 2009-2010 IEP team meeting that Student was to be in the general education classroom with his typical peers for more than 80% of the day.  (Tr. 1658)  According to the Parent, the rest of the team agreed to it.  (Tr. 1658)  Parent helped Student with everything about his academics, including completing his regular education first grade worksheets and/or homework.  (Tr. 1675-1676, 1858)  Parent testified that she did not recall any discussions with staff members taking place with regard to Student being educated in smaller classes for his instruction or discussion of a change in placement for the 2009-2010 school year.  (Tr. 1664)  However, staff members testified that there were always ongoing discussions between some IEP team members that Student could have been more successful in a smaller setting with more frequent sensory breaks outside the classroom, but Parent opposed same.  (Tr. 2050-2051, 1277-1278, 571-574, 1040, 1044, 1313-1314)  In Parent's opinion, Student was capable of handling the first grade regular education work during the 2009-2010 school year.  (Tr. 1657)

In November, 2009, Parent noticed aggressive behaviors, profanity and frequent bowel movement accidents at home.  (Tr. 1660-1661)  At the same time, Student's communication log at school stated, according to the Parent, that everything was, "just fine." (Tr. 1661)  In her opinion, Parent believed that bullying by other Students was causing his aggressive behaviors during that school year.  (Tr. 1669-1672)  District took data on Student's interactions with other students and Parent's bullying claims were not substantiated during 2009-2010.  (Tr. 1729-1730)[8]  Parent declined a meeting with the assistant superintendent and principal to discuss this issue.  (Tr. 1733)  Student's report card for the 2009-2010 school year indicated that academically he was doing,

---

[8]

Plaintiffs allege that the School District refused to address any bullying concerns until March 2010, and that the school principal never notified the Mother that she was looking into the concerns or the results of any investigation.  (Complaint at Paragraph 38; Transcript at p. 545.)  Testimony on behalf of the School District, cited above, indicates that the school investigated but found nothing to support the Parents' allegation that the Student was being bullied.  Plaintiffs do not provide discussion as to the bullying allegation in their Motion.

"just fine," but as far as Parent was concerned he had regressed in everything. (Tr. 1682, Ex. J-116) However, Student's intervention specialist for the 2009-2010 school year was unaware of the fact that mom was doing Student's worksheets. (Tr. 2062-2063)

Parent testified that she had no recollection that extended school year (ESY) services were offered to Student for the summers of 2010 and 2011 and Parent declined the services for both years. (Tr. 1697, 1739-1740, Exs. J-49)

The Principal of Whitney Elementary School testified that she had recess and lunch data collected for thirty (30) days to investigate Parent's claim of Student being bullied, but evidence did not substantiate the Parent's claim. (Tr. 532) Parent was invited to attend a meeting with Principal and HR Director to discuss the bullying issue, but Mother failed to attend the meeting. (Tr. 516, 527)

The occupational therapist testified that during the time period between the two FBA 's (November, 2009, - May, 2010) there were many behavioral interventions and sensory breaks utilized throughout the day. (Tr. 570-574, 578-579) Aide, interventional specialist and occupational therapist met, gathered data and determined that Student was more successful in quiet, small work areas than in general education classroom. (Tr. 579-580, 1278) Occupational therapist believed that Student would make better progress toward his IEP academic goals and objectives during the 2009-2010 year by taking his sensory breaks outside of the general education classroom. (Tr. 668) Student's IEP was amended on November 10, 2009, to add a goal to work on Student's lack of ability to request when he needed a break. (Tr. 628, Ex. J-46, Pgs. 629-630).

District's Director of Pupil Services completed a second FBA on Student in early May of the 2009-2010 school year. (Tr. 53, 1994) The Director utilized a week's worth of direct observation of Student that was collected by a special education aide and interviews with the Parent, first grade regular education teacher, and the intervention specialist. (Tr. 59-60, 1967; Ex. J-87-88, Pgs. 1105-1109)[9] An addendum or amendment to Student's 2009-2010 IEP was added as a result of the May, 2010, FBA. (Tr. 1975-1976; Ex. J-47) The addendum included, in part, Student's use of a quiet work and break area such as the foyer, known as the "glass house". (Ex. J-47) When Student was not able to work in the general education setting for whatever reason that was the area that he went to with an aide to do his work. (Tr. 1975) The Director would have included a suggestion in the FBA to teach Student a safe place to run to instead of outside the school building, but Parent did not want that to be part of the FBA. (Tr. 1996-1998) According to the Director, the Parent strongly objected and said

---

[9]

On May 7, 2010, Dr. Abboud met with the IEP team, including the Director of Pupil Services, the Intervention Specialist; and, the Mother, to review the results and amend the Student's IEP. The general education teacher was not in attendance and Plaintiffs assert her attendance was unexcused. (Complaint at Paragraph 42.)

it was unacceptable and the District should just stop the Student from running. (Tr. 1997-1998)[10]

Student's intervention specialist was responsible for reporting IEP progress for Student during the 2009-2010 school year, with the exception of speech-language and occupational therapy.  (Tr. 2040, Ex J-42)  Joint exhibit 130 was an IEP progress report for the 2009-2010 school year.  (Ex J-130)  The intervention specialist was responsible for reporting on IEP goals 1, 2, 5, 6, 7 and 8.  (Tr. 2064-2065, Ex. J-42)  Student's occupational therapist also participated in the development of goals 1 and 2.  (Tr. 619-627, 2066-2067)  These two occupational therapy goals involved proper writing mechanics and independently tying his shoes.  (Tr. 619-627)  The occupational therapist testified that they utilized baseline data on upper and lower case letters ensuring that Student was able to write letters with proper size and space between the words, so that his writing was legible.  (Tr. 619-620)  Further, they worked on letter alignment on three-lin e paper to measure out small letters, tall letters and hang down letters.  (Tr. 620)

Goal 1 dealt with Student's adequate spacing and proper writing mechanics.  (Tr. 620, 2065-2066)  He mastered this handwriting goal by the end of the school year.  (Tr. 2066-2067, Ex. J-130)  Goal 2 dealt with Student's shoe tying objective, which he did not master, but progress was made during the course of the year.  (Tr. 2067, Ex. J-130)  Unfortunately, Student did not wear tie shoes to school all of the time.  (Tr. 2067)

Goals 3 and 4 were speech and language therapy goals.  (Tr. 2046-2050, 2065)  The IEP progress report, along with the SLP testimony, established that Student mastered both of these speech and language therapy goals during the 2009-2010 school year  (Tr. 2446-2451, Ex. J-130)

Goal 5 was a sequencing goal whereby Student would identify and correctly sequence events using three pictures and/or illustrations.  (Tr. 2068-2069)  Student mastered goal 5 by the end of the school year.  (Tr. 2069, Ex. J-130)

Goal 6 involved Student following classroom routines and schedules independently.  (Tr. 2069-2070, Ex. J-42)  He made progress on part of the goal, regressed on part and mastered the other parts of the goal.  (Tr. 2069-2070, Ex.

---

[10]

Plaintiffs assert that "the May 7, 2010 IEP Amendment only sufficed to reiterate accommodations that the Student had been receiving the entire year as [a] means to address his behaviors;" "did not provide anything new to address [the Student's] behaviors;" and, "provided for the continued seclusion of [the Student] in the glass house."  (Complaint at Paragraphs 43-45; Exhibit 47.)  The Addendum was reviewed at the meeting with the Mother and she agreed to its implementation.

-12-

J-130)  He mastered being able to follow the lunch and recess routine.  (Tr. 2069-2070, Ex. J-130)  He made progress on the other transitions during the day (Tr.2070)  He regressed on following classroom teacher task direction. (Tr. 2070)

Goal 7 dealt with independently predicting  a likely outcome of a story and Student mastered that part of the goal.  (Tr. 2071, Ex. J-130)  Another part of goal 7 involved Student independently stating one personal connection to the story. (Tr. 2071)  Student made progress, but he did not master this part.  (Tr. 2071) Another part of goal 7 involved when given a grade level story, Student would answer literal questions, why, how and when etc.  (Tr. 2071)  He made small progress at the end of the year.  (Tr. 2072)

Goal 8 was the new goal that was added during the year.  (Tr. 2072)  The goal dealt with when Student perceives a task as challenging, that he will use words or picture cues to request a break.  (Tr. 2072-2073)  He made progress on that goal by the end of the school year.  (Tr. 2073)

2010-2011 School Year:

The Parent withdrew Student from the District and accepted the Ohio Autism Scholarship Program during the 2010-2011 school year.  (Tr. 808-809)[11] Parent  turned  down  a proposed district placement at Chapman Elementary School for the 2010-2011 school year because Student was not going to be mainstreamed.  (Tr. 1738)  Parent placed Student at the STEPS Center for Excellence in Autism.  (Tr. 736-738, 809-810)  The current program coordinator of STEPS inclusion program testified that Student was one of 24 students at  the St. Adalbert's Inclusion Program.  (Tr. 737-738)  Student was enrolled in the first grade classroom by his Parents' preference and in program coordinator's opinion, it was not an appropriate  placement for Student.  (Tr. 741)  Student's younger brother was in the very same class and within a short period of time, Student was moved to a second grade curriculum.  (Tr. 741-742)

The coordinator of STEPS testified that Student had problems staying in the general education classroom due to his behavior.  (Tr. 742-743)  Student could not remain in the regular education program because of his behaviors.  (Tr. 747-748)  He was causing problems for the other children in obtaining an education.  (Tr. 748)  In smaller settings, Student had greater success at STEPS. (Tr. 749)  On or about November 15, 2010, a recommendation was made to the Parents for Student to transfer and attend the REACH Program at the STEPS Strongsville location.  (Ex. J-38, Pg. 269; Tr. 751-752, 755, 774)  This program provided Student a smaller room, smaller classes, higher teacher to student ratio, at a different location.  (Tr. 751)  According to the coordinator of STEPS, this program also did not turn out to be a good placement for Student.  (Tr. 810)

---

[11]

The Student did not attend a Strongsville school during the 2010-2011 school year.  (Complaint at Paragraph 48.)

-13-

Parents withdrew Student from the STEPS program during December, 2010. (Tr. 809)

On or about January 4, 2011, Parents placed Student at the Behavioral Intervention Institute of Ohio (BIIO) (Tr. 844; Ex. J-127) The clinical director testified in this matter. (Tr. 812-900) This autism scholarship provider program utilizes behavioral technicians as direct care providers and they follow a treatment plan similar to an IEP, to target goals to accomplish in one year. (Tr. 823) The class size was 1 on 2 or 1 on 4 with a specific behavioral technician. (Tr. 826) This program modified Student's work and utilized a treatment plan. (Tr. 822-830) At the end of the school year in May, 2010, the clinical director testified that Parent was happy with the way Student acted with his peers. (Tr. 840-841) There were no typical peers at BIIO during the 2010-2011 school year in the 1:2 or 1:4 classroom with Student. (Tr. 869-870) Behavioral technicians at BIIO are only required to possess a high school diploma in order to qualify for a job. (Tr. 870) The clinical director did not know that Student was not returning for the 2011- 2012 school year, because Parent was concerned about the amount of academics Student was receiving at BIIO. (Tr. 874-875) According to this witness, Parent believed that Student was starting to regress academically at BIIO. (Tr. 875) This witness did not agree with Parent, because in the opinion of this witness, behaviors must be controlled before academics can be learned. (Tr. 875) BIIO was more of a clinical setting rather than an educational setting according to the clinical director. (Tr. 885)

Parent testified that predominantly Student did well in his placement at BIIO during the 2010-2011 school year although the facts appear to indicate a different conclusion. (Tr. 1745- 1747, 1757; Exs. J-51, pg. 734; J-128)[12]

Parents were happy with the 2010-2011 IEP that the District prepared for Student. (Tr. 1833; Ex. J-50) Parent testified that the draft 2010-2011 IEP was received and reviewed with her advocate and they collaborated on goals that were emailed to the District and said goals were included on the IEP. (Tr. 1728; Ex. J-50).

Parent returned Student back to the District for 2011-2012 school year because BIIO was too costly and just not a fit for Student. (Tr. 1688-1689)

2011-2012 School Year:

_____

12

Despite the fact that the School District team and the Mother met in May 2010 after the Student's escalating behaviors prompted an additional FBA, the Parents state that during the 2010-2011 school year they learned for the first time that the student was having extreme difficulty functioning behaviorally in the classroom without the proper supports. The Parents state that the educators at BIIO were able to determine and implement appropriate supports for the Student to be successful behaviorally at school. (Plaintiffs' Brief at p. 6.)

Prior to the April 21, 2011, IEP meeting, Parent and her advocate received a draft of the 2011-2012 IEP. (Tr. 1758-1759) Further, the Parent and her advocate then met with the Special Education Supervisor to provide some initial feedback concerning the IEP; prior to the actual meeting. (Tr. 1759) Parent attended the 2011-2012 IEP meetings with her new advocate, a 35-year educator with the Solon City School District. (Tr. 1690-1691) Parent testified that she did not understand what constitutes a change in placement with regard to the 2011-2012 IEP, but that she agreed to the IEP, didn't disagree with any part of it, and consented to its implementation. (Tr. 1692, 1759-1760; Ex.J-53)[13] Her testimony indicated that she was aware that Student would be taught by an intervention specialist for 240 minutes (4 hours) in the Special Class Learning Center (SCLC). (Tr. 1759-1760; Ex. J-53)[14] According to the Special Education Supervisor, at the time that this IEP was signed on April 21, 2011, there was discussion between the Parent and her advocate that the District needed to keep Student in a smaller class setting, similar to what he had had this year when they had met. (Tr. 1350, 1855; Ex. J-53) There was no discussion as to this being a change in placement, because the team looked at it as to the services that Student required in order to have his needs met, and where his services would take place. (Tr. 1351; Ex. J-53) Parent testified that she was more than willing to create a

---

[13]    Plaintiffs allege the Mother did not clearly understand what had taken place when she signed the IEP; that she was required to sign the IEP or else the Student would've been withdrawn from the scholarship program; and, that the IEP was not appropriate.

[14]    Plaintiffs contend that the School District changed the Student's placement without the Parents' consent by placing him in a Special Class Learning Center ("SCLC") without typical peers. (Complaint at Paragraph 50; Plaintiffs' Brief at p. 6.) Plaintiffs claim the 2011-2012 IEP fundamentally changed the Student's Least Restrictive Environment from general education (80% of the time with typical peers) to a room outside of the general education classroom. (Complaint at Paragraph 51; Joint Exhibit 35.) Plaintiffs claim that the School District did not provide prior notice of changing the Student's placement, nor did the School District follow proper procedures in seeking parental consent to change the Student's placement. (Transcript at pp. 1321-23.) However, the record reflects that the Mother attended the entire IEP meeting on April 21, 2011; provided input; acknowledged receipt of procedural safeguards; and, signed the IEP in agreement. (Transcript at p. 1760; Joint Exhibit 53, 4/21/11-3/23/12 IEP.) When asked whether she agreed to the implementation of the Student's 2011-12 IEP, the Mother responded in the affirmative and admitted to having no disagreement with any part of the IEP. (Id.) She indicated she was aware and agreed to Student receiving 240 minutes of direct instruction daily in the SCLC with an intervention specialist. (IHO's Decision, p. 21; Transcript p. 1760; Joint Exhibit 53, 4/21/11-3/23/12 IEP.)

-15-

program within the SCLC room because she wanted to serve his needs first.  (Tr. 1855)  She wanted to explore the option for him where Student was not with typical peers in that room.  (Tr. 1855)  At the time that the 2011- 2012 IEP was developed, Parent had not decided to bring Student back to the District for that school year.  (Tr. 1762-1763; Ex. J-53)

During July, 2011, Parent requested that District provide Student with an Independent Educational Evaluation.  (Tr. 1753-1754)  District agreed to same, and Parent advised the District in early August, 2011, that Student would be returning to the District for the 2011-2012 school year.  (Tr. 753, 1763-1764)  However, on August 15, 2011, Parent raised the issue that District provide help with other options for Student, including an outside placement.  (Tr. 1765, 1767)  On August 23, 2011, at a meeting attended by IEP members the day before school started, Parent requested placement at Monarch School.  (Tr. 1770)  The District denied the request at that meeting.  (Tr. 1769-1770; Ex. J-20)

Student returned to District's Surrarrer Elementary for the 2011-2012 school year from the STEPS and BIIO placements the previous  year.  (Ex. J-61)  The Supervisor of Special Education determined that an outside consultant would be retained to conduct another FBA on Student because of his prior year behaviors  at STEPS and BIIO.  (Tr. 1567, Ex. J-61)  Christine Reeve, a Board Certified Behavioral Analyst, Ph.D. level, was retained by the District to conduct the FBA at the beginning of the 2011-2012  school year.  (Tr. 1561-1562, 1567, Ex. J-61)  Dr. Reeve had behavioral data collected by intervention specialist Frederick prior to her two scheduled observations of Student on 9/9/11 and 10/17/11.  (Tr. 1576, 1608; Ex. J-61)  The first observation lasted three (3) hours and the second lasted  45 minutes.  (Tr. 1577; Ex. J-61)  No significant behaviors were observed on either observation.  (Tr. 1578; Ex. J-61)  Dr. Reeve wanted to talk to the parents.  (Tr. 1576)  Parents sent an email that they were not able to meet with her in the District and they would not be able to do a conference call.  (Tr. 1576)

Dr. Reeve's opinion after her observations was to slowly transition Student into more general education situations.  (Tr. 1615-1616, 1635-1637; Ex. J-61)  Dr. Reeve testified that in her opinion, Mr. Frederick has a very good rapport with his Students. (Tr. 1598)  He is an organized teacher who utilizes very good strategies with his students to keep them engaged on difficult cases.  (Tr. 1598-1599)  She further stated that in her opinion, Student was being successful in teacher Frederick's class utilizing a visual schedule, visual cuing, and verbal redirection. (Tr. 1598, 1613-1617)

Student's intervention specialist (Jason Frederick) for the 2011-2012 school year testified in this matter.  (Tr. 1105-1106)  The size of his classes were a maximum of seven children, but typically three children in the afternoon classroom at the time Student was in his room. ( Tr. 1114-1115)  In math, Student was using the third grade curriculum and doing quite well.  (Tr. 1115)  Student's intervention specialist participated in writing the 2011-2012 IEP with the other

team members in April, 2011.  (Tr. 1118-1121)  The intervention specialist testified that because of Student's inappropriate behavior problems in his prior year placement, mathematics goals and objectives were not addressed in the IEP. (Tr. 1120; Ex. J-53)  Specialist testified that the 2011- 2012 IEP established the small class learning center (SCLC) as Student's LRE.  (Tr. 1138; Ex. J-53) Specialist further testified that Student's 2010-2011 IEP had the LRE in general education more than 80% of his services.  (Tr. 1135-1137; Ex. J-50) When asked to compare the two IEP's as to whether that would be a change in placement, the specialist did not know.  (Tr. 1138; Exs. J-50, J-53)  Further, there were not any goals or objectives with regard to the acquisition of vocabulary on the 2011-2012 IEP, because the IEP was written to address behaviors.  (Tr. 1140; Ex. J-53) Specialist recalled  discussions during the 2011-2012  IEP meeting about trying to increase Student's time in general education.  (Tr. 1148-1150)

        Student's occupational therapist that participated on District's 2011-2012 IEP team in April, 2011, did a prior observation at BIIO for his three year re-evaluation.  (Tr. 1181, 1191, 1208-1209, 1264-1265, Ex. J-38, Pg. 281)  The District's occupational therapist testified that BIIO did not have a sensory plan for Student.  (Tr. 1183)  District's occupational therapist had previously co-authored a book dealing with occupational therapy in school settings and owned her own occupational and physical therapy company with 37 employees.  (Tr.1156, 1158, 1199, 1201)  In her opinion, Student was doing very well at Surrarrer Elementary during his limited time there during the 2011-2012 school year.  (Tr. 1196)  The therapist stated that  Jason Frederick, the intervention specialist  teacher, automatically built in sensory breaks into Student's daily routine.  (Tr. 1185-1186) Further, he automatically built in sensory strategies that were utilized by Student. (Tr. 1186)  Mr. Frederick used his professional judgment  as to which sensory choices would best benefit Student and sometimes he would allow Student the choice to pick his own sensory break.  (Tr. 1235)  It was very apparent to this IHO, that the occupational therapist held teacher Frederick in very high regard in teaching Student.  (Tr, 1185-1186, 1234)  The therapist attended the spring 2011 ETR and IEP meetings with regard to Student on 3/22/2011, 4/6/2011, and 4/21/2011, with the Parent and her advocate in attendance.  (Tr. 1245, 1254, 1264-1265)  This occupational therapist testified that Parent did not present any concerns to her with regard to occupational therapy and that Parent agreed to have meetings with fewer staff people present.  (Tr. 1246, 1255)  Later in the 2011-2012 school year, the therapist desired to speak with Dr. Barry, the doctor who completed an IEE on Student, with regard to things that impacted Student's occupational therapy.  (Tr. 1242-1243)  The occupational therapist was not permitted verbal discussions by and between Dr. Barry and herself, but  was only permitted written emails between the parties.  (Tr. 1243-1244)

        A school psychologist from the District testified that she was involved in Student's education from pre-school, kindergarten (2008-2009), first grade (2009-2010) and the third grade (2011-2012) school years, with the exception from March 2010 to June 2010 for a maternity leave.  (Tr. 1267-1278)  Because of her maternity leave, she was not involved with  the  2010- 2011 IEP.  (Tr.

1277-1278)  In her testimony,  she related  how Mother did not want Student pulled out of core academics in the general education classroom for behavioral problems or sensory breaks during the 2009-2010 school year.  (Tr.  1277-1278) IEP team members, including the intervention specialist for the 2009-2010 school year, all agreed that Student would be better served with smaller classes and less distractions.  (Tr. 1278, 1343-134)  She testified that two (2) ETR's were needed for Student in March, 2011, and January, 2012, because of the many new independent evaluations after the first ETR took place.  (Tr. 1285)  The ETR team believed that all of the evaluations should be incorporated into the ETR, to obtain a complete assessment of Student's present levels.  (Tr. 1285)  In her opinion, both ETR's contained very similar present levels and needs for Student. (Tr. 1285) The District checked with STEPS and BIIO, Student's educators for the 2010-2011 school year, and were advised that Student was on target and track academically for his grade level with the exception of reading comprehension. (Tr. 1289-1290) Because Student's 2010-2011 school year presented many behavioral challenges, three IEP team members determined that a new FBA should be completed by Dr. Reeve, to obtain a new "set of eyes" for this Student's 2011-2012 school year.  (Tr.  1291)  The BIIO director did not see behaviors being a problem for Student at the time of the first ETR meeting, but BIIO  staff members  found  otherwise  after the first ETR  meeting  in  a later report.  (Tr. 1295-1296; Ex. J-39, Pg. 322)  Non-compliant behaviors, resisting transitions, inappropriate language, licking and smelling of hands were all reported after the first ETR meeting.  (Tr. 1296)

The special education supervisor who attended  most of Student's IEP meetings at District's schools, testified that Student's placement was driven by the needs in his ETR.  (Tr. 1301, 1305, 1309)  The supervisor testified that the IEP teams discussed that Student does much better in a smaller setting to complete work.  (Tr. 1311, 1343)  Starting in kindergarten until today, there were always discussions by the IEP teams that Student does better in a small class learning environment.  (Tr. 1311-1313, 1343-1344)  However, the Parent wanted a general education setting for Student in prior years at the District, until the 2011-2012 IEP.  (Tr. 1313, 1343-1344)  Both the Parent and her advocate suggested that Student needs a small class setting for his services for the 2011-2012 IEP.  (Tr. 1350)  In prior years, the IEP team compromised with Parent by reaching consensus  with  the Parent  for a general education setting with accommodations. (Tr. 1313-1314, 1343-1344)  In completing the 2011-2012 IEP in April, 2011, the IEP team looked at the March, 2011, ETR and Student's 2010-2011 school year at STEPS and BIIO  with the small class settings.  (Tr. 1319-1321, 1344-1345)  The Parent and her advocate discussed with the IEP team that Student needed to be kept in a smaller class setting similar to his 2010-2011 school year.  (Tr. 1350) At both schools in 2010-2011 , the small class settings were the way Student was educated, even though the 2010-2011 IEP had a general education setting as the LRE.  (Tr. 1320-1321, 1344-1345)  Even though the Parent and her advocate both suggested that Student needs a small class setting for the 2011-2012 IEP, and Parent signed the IEP agreeing to its implementation, the supervisor acknowledged that she made a human error.  (Tr. 1321, 1338, 1350, Ex. J-53)

The supervisor admitted that Parent consent is required for a change of placement and that Parent needed to agree to same by her signature on the IEP form where indicated. (Tr.1321; J-53) The Supervisor testified that Student's report card was not consistent with a prior written notice (PWN) during the 2009-2010 school year with regard to Student's problems with the curriculum, when Student's grades were all S and S+. (Tr. 1327-1329, 1341-1342; Ex. J-17, J-116) However, she didn't know if his grades were representative of the work that he completed as opposed to all the work that was offered. (Tr. 1327-1329, 1341-1342)

Student's 2011-2012 IEP had a LRE of a small class learning environment with some services in a general education setting with typical peers. (Tr. 1319-1320; Ex. J-53) The 2011- 2012 IEP prioritized behavior as its goal and academic goals would be revisited after the honeymoon period was over and the team was certain that Student's behaviors would permit learning. (Tr. 1331-1332, 1334-1335; Ex. J-53)[15] Parent was aware and agreed to Student being placed in a small unit with a slow introduction into the general education classroom. (Tr. 1855) She wanted to explore that option for him where he was not with typical peers in that room. (Tr. 1855)

District's regular education third grade teacher for the 2011-2012 school year testified that Student's specials of art, PE, music, and language arts were with the general education children. (Tr. 1353-1355) On October 7, 2011, Student's IEP was amended to include more time for him in her regular education classroom. (Tr. 1354-1355) This teacher attended the spring, 2011 IEP meeting for Student and confirmed that Mom and her advocate did not object to Student's LRE being in the Small Class Learning Center (SCLC). (Tr. 1368-1369) Mom did not request at the 2011-2012 IEP meeting, or any other IEP meeting that year, that Student be in the regular education classroom for additional time. (Tr. 1369, 1379)

On August 23, 2011, the day before school started for the 2011-2012 school year, the Parent attended a parent requested conference with the third grade regular education teacher, the principal of Surrarrer Elementary, the intervention specialist, the SLP, the occupational therapist, and the special education supervisor, to request something other than District's placement. (Tr. 1376-1380, Ex. J-176) This Parent requested conference discussed a language-based program request by Mom so that Student's needs would be met. (Tr. 1379, Ex. J-176) Parent never requested a general education LRE at District's Surrarrer Elementary at this time. (Tr. 1379, 1855; E. J-176) The third grade regular education teacher felt like Parent didn't want Student at Surrarrer and the District was not being given a chance. (Tr. 1377)

In November, 2011, Parent notified the District that she was removing

---

[15]

Plaintiffs argue that the 2011-12 IEP focused on behavior and did not adhere to the Ohio Content Standards for Academics. (Complaint at Paragraph 53; Exhibit 53.)

Student from Surrarrer and placing him at Monarch Private School. (Tr. 1797, 1836) Parent testified that her reasons for removing Student were for a lack of reliability to what was being reported back to her and Accelerated Reader (AR) Tests without her consent and behaviors at home. (Tr. 1798, 1837-1838)

In early November, 2011, the District and Parent held a telephone conference IEP meeting to discuss Parent's request to place Student at Monarch. (Tr. 1797) The District discussed Student's first quarter progress report with Parent that established Student's progress in Mr. Frederick's classroom. (Tr. 1797, 1799, 1819-1820) Parent was requested by District personnel to identify what changes were needed in Student's 2011-2012 IEP to keep him at Surrarrer Elementary School. (Tr. 1798) Parent did not dispute Student's first quarter progress at District's school. (Tr. 1799, Ex. J-136) Parent refused to offer IEP team the problems with Student's program, but requested the IEP team to present her with a new IEP. (Tr. 1798-1799) During the meeting, teacher Fredrick, the Speech and Language Pathologist, and the Occupational Therapist all reviewed Student's progress in their respective areas of instruction. All of the progress reports indicated that between August 24, 2011, and November 4, 2011, Student made progress on every single IEP goal and objective and he even mastered some of the goals. (Ex. J-136) He achieved mastery on waiting his turn being goal #2 and on accessing the type to learn program being goal #7. (Ex. J.136)

Parent was asked by her attorney about her opinion with regard to Student doing well at District's Surrarrer Elementary School. (Tr. 1825) Parent replied that there was such a level of inconsistency from what was being reported back to her through the lack of general communication from the school. (Tr. 1825) Mom stated that she received telephone calls that Student was doing great and he's going into the general education classroom at school, but that he was acting out at home. (Tr. 1825) He had a gaping hole in his shirt from where he gnawed through, saliva on it, torn off. (Tr. 1825) She further stated that Student was being given accelerated reading (AR) tests when she had not even seen the homework. (Tr. 1826) In her opinion, there was a lack of reliability of what was being reported back to her. (Tr. 1826)

This IHO followed up with Parent by asking her what were the reasons for placing Student at Monarch Private School in November, 2011. (Tr. 1836) Parent answered this IHO very similar to her prior responses to her attorney with regard to a discrepancy going on, lack of reliability to what was being reported back to her through the report cards, and the fact that the teacher was implementing AR tests without her consent. (Tr. 1836-1837) Parent further stated that she didn't even receive an effective communication journal and why would the District not want to report to the Parent what was going on. (Tr. 1837-1838) She stated that, "Why would they not want a Parent to have communication with their teachers, with their therapists?" (Tr. 1838) Further she stated that Student was expressing behavior at home with frequent urination in his pants. (Tr. 1838) Additionally, she stated that he was gnawing his shirts and it was a nonverbal expression to her that something was going on here. (Tr. 1838)

Three witnesses testified from Monarch Private School that have worked with Student during this school year since his enrollment of November, 2011. (Tr. 1413-1557) Student's intervention specialist, occupational therapist, and SLP all testified that Student attended Monarch Private School utilizing District's 2011-2012 IEP. (Tr. 1423-1424, 1430-1431) Student has no access to typical peers at Monarch Private School. (Tr. 1429, 1448, 1458) Student's intervention specialist stated that Student's reading and math curriculum at Monarch are on a first grade level. (Tr. 1421, 1454, 1482) Class size is very small at Private School with six kids in her reading class and sensory breaks for Student every 15-20 minutes. (Tr. 1428- 1429, 1446-1447) Many educational services are provided to Student 1:1 or 1:3 by the intervention specialist or associate teachers who are college graduates. (Tr. 1451-1453) Student still does not independently request sensory breaks or breaks to use the restroom. (Tr. 1429, 1436, 1517) Even though behavior is not an issue at Private School according to the intervention specialist, occupational therapist, and SLP, the behavioral prioritized 2011-2012 District IEP is still being utilized at Monarch. (Tr. 1460-1461) No new academic goals or other goals have been written in an Individualized Service Plan ("ISP") by these three staff members as of the date of their testimony. (Tr. 1459, 1471) Even though some of the District's IEP goals have been mastered, private school staff continue to work on the very same IEP goals. (Tr. 1459- 1461) As of March 8, 2012, the private school intervention specialist testified that she is currently working on an "ISP" for Student and it should be completed within the next couple of weeks. (Tr. 1459) She testified that the writing of academic goals for Student is a work in progress at the Private School. (Tr. 1471) In the opinion of the Private School intervention specialist, Student has the skills to attend a general education public school classroom with an aide to support him with instruction and numerous sensory breaks out of the room. (Tr. 1462, 1476, 1483-1484) In her opinion, she would wait until next year to make the change, because of the many transitions that Student has already encountered in his education. (Tr. 1485)

The occupational therapist supervisor at Private School testified that Student is still working on his IEP typing goal, even though he is very good at typing. (Tr. 1493, 1498) The occupational therapist has not performed any formalized or standardized assessments of Student. (Tr. 1504-1505) Student is not currently working on any 2011-2012 IEP occupational therapy goals other than the typing goal, and no new goals have been prepared for Student by this therapist. (Tr. 1504-1505)

The Private School SLP has been working with Student since the end of January, 2012, and this employment is her first job as an SLP from college. (Tr. 1528, 1544) This SLP has also not performed any formal assessments or standardized testing on Student. (Tr. 1547-1548) SLP utilizes District's IEP and no new goals or objectives have been added for Student. (Tr. 1529, 1547) Student is not required to verbalize a request to use the restroom, and the SLP merely points to the direction of the restroom. (Tr. 1536 , 1548) This witness also testified that Student has no access to typical peers at anytime involving her

services.   (Tr. 1554)

(Final Decision of IHO, Pages 4-31.)

The IHO found as follows:

The 2009-10, 2010-11, and 2011-12 IEPs included all of the components mandated by the IDEA.  (IHO Decision at p. 34.)

The 2009-10 use of the "glass house" did not constitute a change in placement, because no fundamental change in or elimination of basis elements of the Student's educational program occurred.  (IHO Decision at p. 40.)

The 2011-12 IEP placement represented the Least Restrictive Environment to allow for meaningful educational benefit.  (IHO Decision at p. 40.)   The special class learning center ("SCLC") had the capacity to meet the Student's individual educational needs.

The IHO found no evidence to support the Parents' claim that a private school placement was necessary in order to provide the Student with a meaningful educational benefit.  (IHO Decision at p. 40.)

The School District committed a technical error with regard to the 2011-12 IEP, because the Parent signed agreeing to the implementation of the IEP, but did not sign giving or not giving consent for the change in placement.  (IHO Decision at p. 40.)  However, the evidence was overwhelming that any procedural violation was not a denial of a FAPE because it did not result in substantive harm to the Student or his Parents.  (IHO Decision at p. 43.)

The failure of the School District to have a transition plan to support and return him to the general education classroom once his behaviors were no longer interfering did not result in the denial of a FAPE given the fact that the Student was not ready to move to the general education classroom during the short, two-month period he spent at Surrarer in the fall of 2011; the Mother testified to wanting continuity for the Student, after the 2010-11 school year had involved three placements outside of the District; and, the short duration of time – from August 2011 when the District was notified the Student would return to early November 2011 when the Student was removed from the District – was insufficient time in which to prepare a formal transition plan.  The IHO reiterated the fact that the Parent signed the IEP, agreeing to the services set forth therein and its implementation.  (IHO Decion at p. 44.)

After considering all of the evidence, the IHO found Plaintiffs failed to meet their burden of proof to establish that the School District denied the Student a FAPE for the 2009-10 school year from December 19, 2009 forward, and for the 2011-12 school year.  The IHO stated as follows:

Argument-Discussion-Conclusions:

The issues of this case involved whether or not the District denied Student a free appropriate public education during the 2009-2010 school year from December 19, 2009 forward and for the 2011-2012 school year. There was a great deal of testimony elicited from witnesses with regard to the amount of time, location and purpose of Student's breaks during the 2009- 2010 school year. All of the witnesses agreed that Student's behaviors escalated after his kindergarten year and during the 2009-2010 1st grade school year. Student's 2009-2010 IEP placed Student in the general education classroom at least 80% of the time and he was not to be removed during teaching of core academics. Parents' case appeared to center on this issue and teachers, aides, occupational therapists, speech therapist, psychologist, and other educational administrators were repeatedly questioned about the amount of time, location and purpose of Student's breaks during that school year. Parent's position in reply to one of my questions indicated that there were a lot of measures and ways where you can keep a child in a general education classroom, so that he didn't miss core academics. This testimony from the Parent followed the occupational therapist and other educators who testified that it was more beneficial for Student to leave the general education classroom for a break due to escalating behaviors. In that way, he could regain control and then return to the classroom ready to learn in a shorter period of time.

I found it interesting to note that Parent's position about Student not missing core academics in the general education classroom with escalating behaviors did not appear to consider the other children in the classroom. Further, I was also intrigued by the Parent 's emphasis on the loss of minutes each day in the general education classroom, when compared to the twenty one days lost in absences that year as shown on his final report card. Clearly, illness related absences are unfortunate and blameless, but twenty-one days amounts to 10-15% of the entire school year calendar. Obviously, a much more significant amount of core academics were missed in the general education classroom without anyone being at fault.

The District conducted two (2) Functional Behavioral Assessments (FBA) during the 2009-2010 school year with regard to Student. These assessments determined that Student's behaviors were being caused by his frustration over his academic task avoidance, to gain attention from adults, and his failure to be able to verbally request when he needed a break. In my opinion, the District in completing two FBA's in one year was being very proactive in handling Students escalating behaviors.

The Parent was very concerned about Student running from the building on approximately 3-4 occasions during the year. Although Student was with an aide when he ran, it was fortunate that he stopped and returned to the building when requested to return. Clearly, the Parent was concerned about the safety issue of the Student running out of the building. However, I was quite surprised

and disappointed to hear the testimony of the Director of Pupil Services state that the Parent strongly objected to a plan to teach Student a safe place to run to. According to the Director's testimony, the Parent felt that was unacceptable and the District should just stop him from running.   The Director testified that it is a common occurrence for incensed children, when they want to escape and can't access their words , that they just bolt.  In the Director's opinion, it was better to give him a safe place to run to, and teach him that as an intermediate strategy, until they could get him to stop leaving a situation when he was agitated or frustrated.

Another issue that arose during the 2009-2010 1st grade school year involved the Parent's allegations that Student was being bullied by other children. In the opinion of the Parent, many of the problems involving Student's escalating behaviors during the 2009-2010 school year dealt with bullying.  Many witnesses testified contrary to Parent's opinion with regard to this issue.  The Parent failed to sustain her burden of proof on the bullying issue.  The overwhelming body of evidence certainly did not support Parent's claim that Student was being bullied by  other children.

The 2010-2011 school year was not one of the issues raised in this case for my decision with regard to FAPE, but Parent introduced testimony and  exhibits about  Student's education that year.  The Parent withdrew Student from the District with regard to the 2010-2011 school and accepted the Ohio Autism Scholarship program.  In my opinion, the 2010-2011 school year education at three different educational placements certainly effected Student's 2011-2012 school year, according to the witness testimony.  Because Parent placed Student in three different educational placements during that year, there was a lack of consistency, structure and routine, so necessary for this autistic Student, during the 2010-2011 school year.  A significant amount of testimony was offered at the hearing involving the three placements which included the St. Adalbert's STEPS Center for Excellence in Autism Program, the Strongsville Reach Program at STEPS, and the Behavioral Intervention Institute of Ohio (BIIO) Program.

The current program coordinator for the inclusion STEPS program at St. Adalbert's testified that a lot of transitions during a short period of time, without consistency, is a problem for an autistic child. Student attended the STEPS program at St. Adalbert's for 2-3 months.  He attended the STEPS Strongsville Reach program for one month. He was then withdrawn by his Parents, after the Christmas break,  from the STEPS programs.  The STEPS current program coordinator testified that from what they observed, this placement was not an ideal placement for Student.

Student was placed by his Parents at BIIO after the Christmas  break.  The clinical director of BIIO testified in this matter that Student attended BIIO from January 4, 2011, to June, 2011, or the end of the 2010-2011 school year. According to the clinical director, the Parent was concerned with the amount of academics that Student was working on at BIIO.  At the end of the school year,

Parent informed them that she was working on transitioning Student.  The clinical director testified that Parent was concerned that Student was starting to regress academically.  The Parent was looking for a new placement where he could have an increased amount of academics.  Parent testified that she returned Student back to the District for the 2011-2012 school year, because BIIO was too costly for Parents and just not a fit for Student.

During the summer prior to the start of Student's 2011-2012 school year, the District offered an Extended School Year (ESY) program to Student, which the Parent declined.  The Parents visited out of District placements for Student during the summer, including the Monarch Private School for Autism.  At an August 15, 2011, meeting for Student, prior to the start of the 2011-2012 school year, Parent raised the issue with regard to asking for other options for Student, including an out of District placement.  On August 23, 2011, at a meeting attended by IEP members the day before school started, Parent requested placement at Monarch Private School, a language enriched program.  The District denied the request at the meeting and Student started school at District's Surrarrer Elementary for the 2011-2012 school year.

The District retained a Board Certified Behavioral Analyst,  Ph.D.  level to conduct another FBA, because of Student's prior year behaviors at STEPS and BIIO.  No significant behaviors were observed on both observations by the analyst.  Student attended District's school for 2½ months, prior to Parent placing him at the Monarch Private School.  On November 9, 2011, the District and Parent held a telephone conference IEP meeting to discuss Student' s placement at Monarch and to go over the first quarter progress report that established Student's progress in Mr. Frederick's classroom.

Parent was asked twice during the hearing for her reasons why she removed Student from District 's Surrarrer Elementary School and placed him at Monarch Private School.  Parent answered that, in her opinion, there was a lack of reliability from the District as to what was being reported back to her through the report cards and communication logs.  Further, she stated that the District was implementing accelerated reading (AR) tests, without her consent, and that Student was expressing behaviors at home.

Parent did not dispute Student's first quarter progress report at District's Surrarrer School and refused to offer the IEP team an opinion with regard to her problems with the current 2011- 2012 IEP and/or what needed to be done to correct same. Student started at Monarch Private School and Parents filed for due process one month later.

I found it very troubling that the Parent had declined the ESY services that District had offered to Student over the past two summers.  Many Districts are extremely reluctant to offer ESY programs to students and in this case it was offered twice and declined both times.  I cannot understand the reasoning for Parent's decision with regard to the ESY program.  Her answers to questions

related to this issue were really not supportive of sound educational decisions. Parent had an advocate during most of the 2009-2010 and 2011-2012 school years, and her own testimony appeared to indicate that the District was quite receptive to Parent's requests for IEP goals, after the advocate entered the process, during those school years.

At every step of the way, District worked in collaboration with the Parents and their advocates to provide Student with an Individual Education Program and a Free Appropriate Public Education during the 2009-2010, 2010-2011, and 2011-2012 school years. All three (3) IEP's that District prepared were tailored to confer meaningful educational benefits for Student and the facts of this case totally supported same. Student did not attend District's school during the 2010-2011 school year, but Parent's placements utilizing the Autism Scholarship Program used District's IEP to some extent. Further, the Monarch Private School since November, 2011, has been using District's 2011-2012 IEP prepared for Student.

The Petitioner's attorney stated in the post hearing brief that the 2009-2010 report card is the most comical of the evidence presented in this case. The attorney further went on to say that the report card is not an accurate reflection of how Student was doing in the general education classroom. The Parent's attorney stated that there was no data to support Student's grades given by Teacher as being valid, since Parent completed many graded assignments for Student
at home. However, there is really no way to know how the general education 1st grade teacher determined her grades of S and S+ for Student, because relevant questions for this witness with regard to grades were never asked by either attorney. How does Parent's attorney know that the 1st grade teacher graded many of the assignments completed at home by Parent? The page numbers cited by the attorney in the transcript, as proof of this point, are not relevant to establish the attorney's position involving "graded" assignments. The burden of proof was on the Petitioner to establish that the report card was not an accurate reflection of how Student was doing in the general education classroom. The Parents' case failed to meet that burden of proof.

Additionally, I do not think that a Parent doing a student's work is comical for the child, if it results in a report card that is not accurate. Further, the Petitioner's case now incredibly argues two years later, that the report card was not valid, because Parent completed many of the "graded" assignments for the Student at home.

As previously stated, the 2011-2012 IEP prepared by the District and the IEP team was reasonably calculated to provide Student with a meaningful educational benefit. Based upon the testimony and exhibits, the District educational staff utilized the April 5, 2011, ETR, Parents' and advocate's recommendations, and the Ohio Academic Content Standards to prepare the IEP. The IEP was drafted by the Special Education Supervisor in consultation with Mr.

-26-

Frederick, the intervention specialist, the SLP drafted the communication goals and the occupational therapist drafted the occupational therapy goals and sensory needs. A draft was provided to the Parent and the Supervisor for Special Education met with the Parent and her advocate and they presented additional suggestions or wording changes to different goals and objectives. The IEP team met and identified that the IEP was prioritizing behavior at that point, and the Parent and advocate were part of that IEP team decision and agreed to same. According to Student's April 5, 2011, ETR, at the placements Student was at in the 2010-2011 school year, he was having some issues with acting out behaviors. He was running, noncompliant behaviors, not following directions, writing on tables, hitting staff, and inappropriate comment-type things. The IEP team identified Student's needs, prepared goals and objectives to address those needs, identified how Student's progress would be monitored, identified the special education and related services that were needed, and finally discussed the least restrictive environment 111 which the special education and related services could be delivered, otherwise known as placement.

An employee from the Educational Service Center, a branch of the Ohio Department of Education, was called as a witness by the Petitioner. This witness trains educators with current initiatives by the ODE. Witness testified that currently and for the past six (6) years, the school districts in Ohio are using the Ohio Academic Content Standards. In reply to several questions from District's attorney, the witness answered in the affirmative that an IEP is required to address any skill deficits which may place the student's goals below their grade. The witness then answered in the affirmative, that if one of those deficits is involving behavior, you would need to address that prior to moving on to academics. Further, the witness answered in the affirmative that it was true that the Ohio Department of Education asks districts to prioritize the needs of students when writing their goals.

The Petitioner in its post-hearing brief argued that there was a denial of FAPE due to an inappropriate IEP. However, Petitioner failed to meet its burden of proof by establishing areas of need that were not addressed by the goals and objectives in the 2011-2012 IEP. Additionally, it was interesting to note that all three Monarch witnesses testified that behavior was not an issue for Student at the Monarch Private School, according to the intervention specialist, occupational therapist, and SLP. However, the District's behavioral prioritized 2011-2012 IEP was still being utilized at Monarch Private School, by all three Monarch witnesses at the time of this due process hearing in March, 2012.

The Petitioner failed to meet its burden of proof to establish that the District denied Student a FAPE for the 2009-2010 school year from December 19, 2009, forward and for the 2011-2012 school year.

Student's Parents are entitled to tuition reimbursement under IDEIA, only when a public school district fails to make a FAPE available to the Student. See: *Florence County Sch. Dist. vs. Carter*, 510 U.S. 7, 15 (1993). The Parents

unilaterally enrolled their son at Private School and they are entitled to reimbursement for the cost of that enrollment if (a) the hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to the enrollment; and (b) the private placement is appropriate. See: 34 C.F.R. § 300.148(c); *Wise v. Ohio Dept. of Education*, 80 F. 3rd 177, 182 (6th Cir. 1996); *Doe v. Metropolitan Nashville Public Schools*, 133 F. 3rd 384 (6th Cir. 1998); *Burlington v. Dept. of Educ. of Mass.*, 471 U.S. 359, 374 (1985).

The more recent case of *W.S. ex rel. C.S. vs. Rye City School District*, 454 F. Supp. 2d 134 (S.D. N.Y., 2006), further supports District's position that only if a public school district fails or is unable to offer FAPE does the appropriateness of a private placement become relevant.  Additionally, in the case at bar, the Petitioner failed to admit any written documents or exhibits into evidence to establish Parents' claim of payment and/or debt to the Monarch Private School and the right to reimbursement damages.  Further, Parents failed to present any testimony proving their damages and/or relief requested.  The hearing record is totally empty with regard to this issue.  Without some written evidence and/or testimony on this issue, the issue of damages and a possible reimbursement claim was not properly addressed and supported by the Petitioner.

Therefore, this IHO will not proceed to the question of whether or not the unilateral private placement was appropriate or to any consideration of equitable factors, based upon the above conclusions and the law cited herein.

Decision

I find that all due process procedures were proper and according to law, such that a full and fair hearing was offered to the Parents, Student and the District.

I find that the evidence in this hearing overwhelmingly established by preponderance of the evidence that the District offered and provided Student with a free appropriate  public education (FAPE ) for the 2009-2010 school year from December 19, 2009 forward, and for the 2011-2012 school year.

I find that the evidence offered by the Parent failed to establish by a preponderance of the evidence that the District denied Student a free appropriate public education during the 2009- 2010 school year from December 19, 2009 forward, and for the 2011-2012 school year.  The Parents failed to meet their burden of proof with regard to all of the issues of this case.

I further find that there were no procedural violations by the District involved in the development of Student's 2009-2010, 2010-2011, 2011-2012 IEP's and/or placement decisions and/or any other issues which rose to the level of denying Student's Parents meaningful participation in the decision making process and/or that were significant enough to result in a denial of a FAPE to the Student and/or that caused a deprivation of an educational benefit.

       For the above stated reasons, I hereby find in favor of the District on all of the issues in this case and deny Parents' request for tuition payment and/or reimbursement, compensatory education, and all related costs requested for the 2009-2010 and 2011-2012 school years.

(IHO Decision at pp. 45-54.)

       On June 19, 2012, Counsel for the Parents submitted a Notice of Appeal of the IHO's

decision to the Ohio Department of Education, setting forth ten Assignments of Error.  State

Level Review Officer ("SLRO") Robert L. Mues was appointed to handle the appeal.  In their

Appeal Brief to the SLRO, Plaintiffs' claims were combined into seven Assignments of Error.

Plaintiffs' Assignments of Error, and the SLRO's determinations, are as follows:

      Assignment of Error Number 1: That IHO Taich is partial and biased and demonstrated prejudice to the parents with his decision and his conduct during the due process hearing.
      SLRO Finding: The misspelling of the Student's first name, a common misspelling, was either a typographical error or oversight and does not show bias. The testimony of Record supports the IHO's finding that the Student spent 85-90% of the time during the school year in the general education classroom; sensory breaks and use of a quiet work area were not frequent enough to support Appellants' argument that the IHO's finding was against the manifest weight of the evidence; the testimony at the hearing supports the IHO's finding that the Student's Mother did not want the Student taken out of the classroom at the beginning of the first grade year for sensory breaks; and, the IHO appropriately characterized the parents' wish that the Student receive academic instruction in the general classroom setting, regardless of behavioral issues.

      Assignment of Error Number 2: That IHO Taich erred with his final determination that the District provided N.S. a FAPE by offering and implementing an appropriate IEP in the 2009-2010 school year, and by finding that N.S. made meaningful progress in the 2009-2010 and 2011-2012 school year.
      SLRO Finding: The Student was receiving most of his educational instruction within the general classroom setting; the SLRO could not find the testimony relied upon by Appellants in asserting the Student was actually educated in the "glasshouse" or doorway area; the 2009-2010 progress report accurately reflects the Student's progress; the testimony reflects that while worksheets and time limits were modified, the Student did not receive a modified curriculum; and, the School District had no knowledge that the Parent was competing the Student's assignments at home.

      Assignment of Error Number 3: That IHO Taich erred with his final

determination that the District did not commit a procedural violation in changing N.S.'s placement depriving parents from meaningful input and resulting in a denial of FAPE to N.S. for the 2009-2010 school year.

SLRO Finding: While the School District acknowledges that there were changes in the proportion of services provided and location of some instruction, the School District argues that there was no change in placement because the special education programming and related services were not altered. The SLRO found that regardless of changes, the student spent the majority of his school day in the general education setting and there was no change in educational placement that resulted in the denial of a FAPE. Occasional removals to the "glasshouse" or doorway to receive services did not alter the educational programming set forth in the IEP.

Assignment of Error Number 4: That IHO Taich erred with his final determination that District properly addressed N.S.'s behavioral issues during the 2009-2010 school year.

SLRO Finding: The facts clearly establish that a Functional Behavior Assessment was completed in November 2009 due to escalating behaviors resulting in the addition of a behavioral goal. Another FBA was completed on May 4, 2010, resulting in a second addendum to the Student's IEP. The School District responded appropriately to the Student's escalating behaviors and addressed them properly during the 2009-2010 school year.

Assignment of Error Number 5: That IHO Taich erred with his final determination that District's procedural violation of changing and implementing N.S.'s LRE without the Parents' consent did not rise to the level of causing significant harm and resulting in a denial of FAPE to N.S. for the 2011-2012 school year.

SLRO Finding: Appellants offer no evidence of harm resulting in a denial of a FAPE. Although the Parents did not specifically agree to a change in placement, no significant harm resulted. The SLRO believes the parent understood the April 2011 IEP and consented to its implementation.

Assignment of Error Number 6: That IHO Taich erred with his final determination that the April 2011-2012 IEP was appropriate.

SLRO Finding: The Student's 2011-2012 IEP was prepared and designed to address numerous areas of need, including goals and objectives, with a priority on addressing the Student's behaviors. Reviewing the testimony of Jacqueline Lawson, the SLRO found nothing wrong with the prioritization. The SLRO found the 2011-2012 IEP to contain all of the necessary components mandated by the Ohio Department of Education and that it was, therefore, appropriate.

Assignment of Error Number 7: That IHO Taich erred with his final determination when denying the award of tuition at the private placement, transportation reimbursement, compensatory education and all related costs requested for the 2009-2010 and 2011-2012 school year when he made his final determination regarding the denial of FAPE for the 2009-2010 and 2011-2012

school year.

SLRO Finding: The 2009-2010 and 2011-2012 IEPS for the Student provided him a FAPE in the least restrictive environment.  Accordingly, the Parents were properly denied any reimbursement for tuition, compensatory education and other related costs.  Further, the Parents failed to provide any evidence of damages at the hearing. Therefore, no finding can be made in favor of parents for reimbursement of debts or expenses.

On October 18, 2012, the SLRO issued his Decision, finding no merit to any of Plaintiffs' Assignments of Error.  Based on an independent review of the Record, the SLRO found the IHO's factual findings to be supported by specific citations to the testimony and/or exhibits presented at the hearing and found nothing clearly erroneous in the IHO's findings.  In several instances, the SLRO noted the Appellants failure to cite testimony to support their claims.

On January 14, 2013, Plaintiffs filed a civil action in this Court pursuant to the IDEA, 20 U.S.C. § 1400, challenging the decisions of the IHO and SLRO.  In their First Cause of Action, Plaintiffs assert that the IHO erred in his Decision by finding that there was not a denial of a FAPE during the 20009-2010 and 2011-2012 school years.  In their Second Cause of Action, Plaintiff assert that the SLRO failed to comply with OAC 3301-51-05(K)(14)(b)(iii);[16] that the SLRO appears to have "rubber-stamped" the IHO's decision; and, that the SLRO's decision affirming the decision of the IHO was in error.  Plaintiffs ask the Court to annul the decisions of the IHO and SLRO; issue a finding that the School District denied the Student a FAPE for the 2009-2010 and 2011-2012 school years; and, order the School District to reimburse Plaintiffs for

---

[16]

OAC 3301-51-05(K)(14(b)(iii) provides that the official conducting a review of the IHO's decision on appeal must (a) Examine the entire hearing record; (b) Ensure that the procedures at the hearing were consistent with the requirements of due process; (c) Seek additional evidence, if necessary. . . . (d) Afford the parties an opportunity for oral or written argument, or both, at the discretion of th reviewing official; (e) Make an independent decision on completion of the review; and, (f) Give a copy of the written, or, at the option of the parents, electronic findings of fact and decisions to the parties.

their unilateral placement of the Student outside of the School District.

On November 18, 2013, Plaintiffs filed their Motion for Judgment on the Administrative Record.  (Docket #21.)  On January 21, 2013, the School District filed its Memorandum in Opposition. (Docket #23.)

## Applicable Law

In exchange for federal funding, the IDEA requires states to identify, locate, and evaluate "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services." 20 U.S.C. § 1412(a)(3)(A).  A recipient state is then required to provide a "free appropriate public education" ("FAPE") for any such disabled child.  20 U.S.C. § 1412(a)(1)(A). The IDEA defines a FAPE to mean special education and related services that –

> (A)    have been provided at public expense, under public supervision and direction, and without charge;
> (B)    meet the standards of the State educational agency;
> (C)    include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D)    are provided in conformity with the individualized education program required under section 614(d) [20 USCS § 1414(d)].

10 U.S.C. § 1401(9).

In order to provide a FAPE, the State's local educational agencies—typically, the local school district—must create an individualized educational program ("IEP") addressing each disabled child's particular needs. 20 U.S.C. § 1414(d).  The IEP must contain a specific statement of the child's current performance levels; the child's short-term and long-term goals; the proposed educational services; and, criteria for evaluating the child's progress. *Id.*  The school district must then review the IEP on an annual basis to make necessary adjustments and revisions.  20 U.S.C. § 1414(d)(4).  In addition, all participating educational agencies are required to "establish and maintain" certain "procedural safeguards" to ensure that all disabled children receive a FAPE. 20 U.S.C. § 1415(a).

Under the law, parents are part of the team of educators and professionals that work together to develop a student's IEP. The IDEA's implementing regulations do not require "equal" participation, but instead provide that a parent must "be afforded an opportunity to participate in meetings with respect to – the identification, evaluation, and educational placement of the child; and the provision of FAPE." See C.F.R. § 300.501(b) and (c). As set forth in *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 523-24 (2007):

> IDEA requires school districts to develop an IEP for each child with a disability, see §§ 1412(a)(4), 1414(d), with parents playing "a significant role" in this process, Schaffer v. Weast, 546 U.S. 49, 53, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005). Parents serve as members of the team that develops the IEP. § 1414(d)(1)(B). The "concerns" parents have "for enhancing the education of their child" must be considered by the team. § 1414(d)(3)(A)(ii). IDEA accords parents additional protections that apply throughout the IEP process. See, e.g., § 1414(d)(4)(A) (requiring the IEP Team to revise the IEP when appropriate to address certain information provided by the parents); § 1414(e) (requiring States to "ensure that the parents of [a child with a disability] are members of any group that makes decisions on the educational placement of their child"). The statute also sets up general procedural safeguards that protect the informed involvement of parents in the development of an education for their child. See, e.g., § 1415(a) (requiring States to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education"); § 1415(b)(1) (mandating that States provide an opportunity for parents to examine all relevant records). See generally §§ 1414, 1415. A central purpose of the parental protections is to facilitate the provision of a "'free appropriate public education,'" § 1401(9), which must be made available to the child "in conformity with the [IEP]," § 1401(9)(D).

The IDEA requires that each child be educated in the "least restrictive environment" possible. *Id*. § 1412(a)(5)(A). This mainstreaming requirement states that to the "maximum extent appropriate," children with disabilities are to be educated with children who are not disabled. *Id.* Children with disabilities may be removed from regular educational environments "only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* The IDEA placement options, from least restrictive to most restrictive are (1) regular classes (with

provision of supplementary services); (2) special classes; (3) special schools; (4) home instruction;(5) instruction in hospitals/institutions; and, (6) other appropriate environments.  20 U.S.C § 1412(a)(5)(A); 34 C.F.R. 300.115.

School districts must provide a statement in the annual IEP for each student concerning what supplementary services will be provided to the child to enable the child to "to be involved in and make progress in the general education curriculum . . . and to participate in extracurricular and other nonacademic activities." 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(bb); see also 34 C.F.R. § 300.117.  School districts must provide "supplementary aids and services determined by the child's IEP Team to be appropriate and necessary for the child to participate in nonacademic settings."  34 C.F.R. § 300.117.  A student's IEP team is required to include at least one general education teacher to facilitate these goals if the student is or may be participating in the regular education environment.  20 U.S.C. § 1414(d)(1)(B)(ii).

The IDEA provides a hearing process for parents who disagree with their child's IEP. Parents may challenge an IEP by filing a complaint against the local educational agency and requesting a due process hearing. 20 U.S.C. §§ 1415(b)(6)-(8) and (f).

A party that is aggrieved by the findings and decision made by a state educational agency regarding an IDEA claim may file a civil suit.  20 U.S.C. § 1415(i)(2)(A).  In reviewing cases brought under 20 U.S.C. § 1415(i)(2), the District Court must determine (1) whether the state has complied with the IDEA's procedural requirements and (2) whether the resulting individualized educational program is reasonably calculated to enable the child to receive educational benefits. *Burilovich ex rel. Burilovich v. Board of Educ.*, 208 F.3d 560, 565 (6th Cir. Mich. 2000) (citing *Board of Education v. Rowley*, 458 U.S. 176, 206-07 (1982)).  Under both the procedural and substantive reviews, a modified *de novo* review is appropriate.  *Burilovich*, 208 F.3d at 565. The Sixth Circuit explains the "modified de novo" standard of review as follows:

> district courts may not "simply adopt the state administrative findings without an independent re-examination of the evidence," nor may they "substitute their own notions of sound educational policy for those of the school authorities which they review." The amount of "due weight" afforded to the administrative findings varies depending on whether such findings are based on educational expertise. "Less weight is due to an agency's determinations on matters for which educational expertise is not relevant . . . More weight is due to an agency's determinations on matters for which educational expertise is relevant." Stated succinctly, a district court "may set aside administrative findings in an IDEA case only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both."

*Woods v. Northport Pub. Sch.*, 487 Fed. Appx. 968, 973 (6th Cir. Mich. 2012) (citations and internal quotation marks omitted).  "Federal courts are generalists with no expertise in the educational needs of handicapped children and will benefit from the fact finding of a state agency, which is presumed to have expertise in the field."  *Burilovich*, 208 F.3d at 566.

In an IDEA action, the Court "(i) shall receive the records of the administrative proceedings; (2) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate."  20 U.S.C. § 1415(i)(2)(B) (emphasis added).

### Discussion

The Court has thoroughly and exhaustively reviewed the voluminous record in this case, including the decisions of the IHO and SLRO; the filings and briefs of the Parties; all documents of record; and, the hearing testimony cited in conjunction therewith.[17]

---

[17] Plaintiffs provide very little citation to the Record in their Motion, instead referring to prior briefing before the IHO and SLRO.  The Court has reviewed the entire Record in this case and would note that the School District's Response Brief before the SLRO provided the Court with a detailed and thorough discussion of the evidence of record in this case as it relates to Plaintiffs' specific claims.  In both its Response Brief before the SLRO and their Memorandum in Opposition filed with this Court, the School District examined testimony referred to or cited by Plaintiffs, and in many instances documented the testimony was mischaracterized or nonexistent.

## I.  Meaningful Participation.

There is nothing in the Record to substantiate Plaintiffs' claim that the Parents were denied the opportunity to meaningfully participate in the development of the Student's 2009-10 and 2011-12 IEPs.  The IDEA provides that a parent must "be afforded an opportunity to participate in meetings with respect to – the identification, evaluation, and educational placement of the child; and the provision of FAPE."  34 C.F.R. § 300.501(b) and (c).  As stated above, parents play a significant role as part of the IEP team and the team must consider the concerns of and information provided by the parents when developing the IEP.  The IDEA includes procedural safeguards in an effort to protect and ensure parental participation in the IEP process.

The Record is replete with documentation of invitations and correspondence from the School District to the Parents requesting their involvement in the IEP process.  The Mother attended five of the six IEP meetings during the 2009-10 school year and her absence at the May 18, 2010 meeting, which was an annual review meeting for the Student's 2010-11 IEP, was beyond the School District's control.  The Mother took the 2009-10 IEP draft home to share and review with her husband before she signed the IEP indicating her approval thereof.  (Transcript at pp. 1710-1712.)  With regard to the 2011-12 IEP, the Mother attended and participated in all six IEP meetings held between the spring and fall of 2011, during which time the Student's 2011-12 IEP was developed, amended, and ultimately approved.  The Mother was sent a draft copy of the 2011-12 IEP in advance of the IEP team meeting, and she and her advocate held a "pre-IEP meeting" with a team representative to review the IEP and discuss any concerns.  The Mother proposed modifications to the document in advance of the IEP meeting held on April 21, 2011.  (Transcript at pp. 1754-55.)

The evidence reflects an open line of communication between the Parents and the School District.  Parents provided input both orally and/or in writing at the meetings or at home after

receiving a final draft and the desires of the Parents were incorporated into the IEPs when appropriate, even when the School District may have disagreed, including the Parents' request that the Student be placed in the general education classroom during the 2009-10 school year. (Transcript at p. 131.)  In the event the School District declined to implement the requests of the Parents, Plaintiffs were sent Prior Written Notices, as required by law, explaining and describing the disagreement and the actions proposed and/or refused.   After review of the Draft IEPs, the Mother signed both, indicating her approval.  Plaintiffs' claim that they were not accorded the right to make any decisions for the Student during the 2009-10 school year is wholly unsupported by the evidence of record.

Plaintiffs assert that they were not informed regarding the use of the "glass house"; not kept informed of the Student's education; did not have meaningful input into the IEP; and, that progress reports were inaccurate, thus denying them meaningful participation in the IEP process. However, the evidence of Record fails to support these claims.  The "glass house" was used as an area for sensory breaks outside of the classroom, as contemplated under the 2009-10 IEP, which was approved by the Parents; the Parents were integrally involved in the development of both IEPs; and, Plaintiffs have failed to provide accurate citation to the Record or other supporting evidence that proves the Student's progress reports were inaccurate.  Plaintiffs have failed to establish that they were denied meaningful participation in the development of the Student's 2009-10 and 2011-12 IEPs.  Accordingly, the decisions of the IHO and SLRO with regard thereto are affirmed.

**II.     Change in Placement.**

Plaintiffs claim that the use of the glass doorway vestibule (referred to as the "glass house") as a work area for the Student during the 2009-10 school year, and the Student's placement in the SCLC class for the majority of the school day during the 2011-12 school year,

constituted changes in placement of which they were not properly notified and of which they did not approve, thereby denying the Student a FAPE as contemplated under the IDEA.

Under the IDEA, a "change in placement" is defined as a fundamental change in, or elimination of, a basic element of a child's educational program. *Lunceford v. District of Columbia Board of Education*, 241 U.S. App. D.C. 1, 745 F.2d 1577, 1582 (D.C. Cir. 1984). The comments to the U.S. Department of Education's 2004 IDEA regulations explain that "[t]he Department's longstanding position is that placement refers to the provision of special education and related services rather than a specific place, such as a specific classroom or specific schools." 71 Fed. Reg. 46, 687. As stated by the IHO, "[p]lacement involves the continuum of placement options available for a child with a disability, and location involves the physical surrounding in which the child with the disability receives special education and related services." Prior notice and parental consent are necessary when a change in placement is made.

### A.      2009-10 IEP

Plaintiffs claim that the School District's use of the glass house removed the Student from his least restrictive environment unilaterally, without an IEP meeting and without parental consent.

The 2009-10 IEP provided that the Student would be placed in the general education setting, at the Mother's request and in spite of the recommendations of the School District. The Student received core academic instruction from the general education teacher, with the support of an intervention specialist and assistance of a classroom aide, as provided in his IEP. There is no evidence to contradict the IHO's finding that the Student spent 85-90% of his day in the general education classroom. As agreed to by the Mother, the IEP conditioned placement in the general education setting upon the delivery of related services, supports, accommodations, and

modification to assist the Student in the large group setting.  While the Student may have moved in and out of the general education classroom for related services, sensory breaks, or use of a quiet work area as his needs dictated, which in this case included the use of the glass house, the District did not change the Student's educational placement.[18]  The evidence demonstrates that the Student was receiving a consistent educational program and services, as specified in the IEP regardless of whether he was intermittently removed for sensory breaks to the "glass house."

Based on the evidence of Record, the IHO and SLRO correctly determined that there was no fundamental change in or elimination of the basic elements of the Student's education program during the 2009-10 school year and, therefore, no change in placement.  Accordingly, the decisions of the IHO and SLRO with regard thereto are affirmed.

### B.    2011-12 IEP

With regard to the 2011-112 school year at Surrarrer, Plaintiffs allege that they were not properly notified that the Student was receiving more instruction in the SCLC than in the general education classroom and that the Student was improperly removed from his Least Restrictive Environment when he received the majority of his academic instruction in the SCLC during third grade.  Plaintiffs argue that IEP's change from the general education classroom to the SCLC amounted to a change in placement of which they were not properly notified and did not approve.

The Record clearly demonstrates that the Mother specifically agreed to the terms of the IEP which explicitly spelled out that the Student would spend 240 minutes of the school day in

---

[18]

     The School District notes in its Response Brief before the SLRO that the Student was removed only nine times for a sensory break during an eight month period in the first grade.  (Response Brief at p. 8.)  Most of the removals occurred after Christmas and the Mother testified that several were due to the fact that the Student's new medication impacted his behavior during that time.  (Transcript at pp. 1894-96, 1929-30 and 1941.)

the SCLC. During the development of the Student's 2011-12 IEP, the IEP team, including the

Mother, focused on the need to address the Student's escalating behaviors, concluding that

placing the Student in the SCLC would allow him to receive the most educational benefit. There

is no evidence to support Plaintiffs' claim that they were unaware the Student was to spend the

majority of the time in the SCLC under the 2011-12 IEP.

The IHO and SLRO found a procedural violation in the School District's failure to have

the Parents sign off on what they determined to be a change in placement.[19] To the extent that

the failure to have the Parents sign off on the alleged change in placement constituted a

procedural violation, the IHO and SLRO correctly determined that there is no evidence of

substantive harm as a result of that procedural failure. Accordingly, the Court upholds the

determinations of both the IHO and SLRO that the Parents were well-informed of the change to

more significant time in the SCLC and that any procedural notification error on the part of the

School District did not result in a denial of a FAPE.

**III.     Educational Benefit.**

In reviewing cases brought under 20 U.S.C. § 1415(i)(2), the District Court must

determine (1) whether the state has complied with the IDEA's procedural requirements and (2)

whether the resulting individualized educational program is reasonably calculated to enable the

child to receive educational benefits. *Burilovich ex rel. Burilovich v. Board of Educ.*, 208 F.3d

560, 565 (6th Cir. Mich. 2000) (citing *Board of Education v. Rowley*, 458 U.S. 176, 206-07

(1982)). In *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840 (6th Cir. Tenn. 2008), the Sixth

Circuit held that an IEP must be tailored to confer a "meaningful educational benefit." *Id.* at 862.

---

[19]

The School District argues that increased time in the SCLC did not constitute a
change in placement, because the Student's educational experience did not significantly
change.

School districts are not required to maximize each student's potential, but must provide sufficient specialized services so that the student benefits from his education.

The IHO found that both the 2009-10 and 2011-12 IEPs prepared by the School District contained the elements required by law and "were tailored to confer meaningful educational benefits for [the] Student." Plaintiffs assert that neither the 2009-10 nor the 2011-12 IEP were specifically designed to meet the Student's unique needs.

### A.      2009-10 IEP

Plaintiffs argue that the 2009-10 IEP did not clearly address the Student's unique needs in the areas of speech and language; social skills;[20] occupational therapy; specially designed instruction; and, behavior. Plaintiffs also argue that the School District did not implement the 2009-10 IEP as written, but instead "changed service settings, added prompts to skills, modified work, which lead to inaccurate progress reporting" thereby denying the Student a FAPE "because he failed to achieve any meaningful educational benefit on the IEP as it was written." Based on a thorough review of the Record in this case, the Court finds Plaintiffs claims to be without merit.

**Speech Language:** Plaintiffs assert the Student exhibited articulation errors that should have been addressed in the IEP. There is no evidence before the Court upon which to find articulation should have been addressed in the 2009-10 IEP. The evidence of record establishes the Student exhibited language difficulties, not articulation errors. Evaluation of the Student indicated that his articulation difficulties were developmental; articulation would naturally develop over time; and, that the Student was actually above average for his age in articulation. (Transcript at pp. 1055-56.)

Goals 3 and 4 of the 2009-10 IEP were speech and language therapy goals. The Student received 240 minutes per month of speech and language therapy (120 minutes of direct

---

[20]      Plaintiffs state that the IEP did not clearly address social skills, but fail to provide any discussion related thereto. Goals 3 and 4 address the Student's need to improve vocabulary and sentence structure to effectively communicate with peers and adults and the need to participate in unstructured group activities including cooperative play and answering peers' questions using complete sentences. Goals 3 and 4 included provisions for communication; cooperative play; turn-taking; answering questions; and, joining group during unstructured time including recess, lunch and classroom activities.

small group within the speech room, SCLC, or general education classroom and 120 minutes a month of direct individual therapy, not to be removed from core academics, language arts, math, science and social studies.)

**Occupational Therapy:** Plaintiffs claim that the 2009-10 IEP was not appropriate "as it did not incorporate any fine motor goals and objectives to address [the Student's] difficulties with fine motor skills." However, fine motor skills are addressed in Goals 1 and 2, including specific instruction for work with handwriting and shoe tying. The 2009-10 IEP provides that "fine motor/sensory motor preparation strategies would be incorporated during OT sessions to support hand strengthening and development of in-hand manipulation skills and to meet his attention/motor movement needs." (Joint Exhibit 42.)

The 2009-10 IEP provided for 30 minutes per week of Occupational Therapy outside of the general education classroom and 15 minutes within the general education classroom, and testimony confirms that these services were delivered. The out-of-class OT began with a fine motor activity of hand strengthening and/or in-hand manipulation. (Transcript at pp. 2114-16.) When working on these Goals, the Occupational Therapist incorporated supports and accommodations to prevent behavior issues, including visual supports; preferential seating; sensory motor breaks; breaking work down into shorter portions; and, prompts to stay on task. The general education teacher was provided with worksheets to continue working with handwriting and provided a monthly 30-minute consultation with the Occupational Therapist, classroom aide and general education teacher to discuss progress. Progress reports indicate the Student made adequate progress independently tying shoes and mastered goals relating to word alignment and spacing.

**Specially Designed Instruction:** Plaintiffs claim the School District knew the Student needed one-to-one instruction but, aside from use of the glass doorway vestibule, failed to include one-to-one instruction in the IEP. The School District argues that there was no evidence the Student needed one-to-one instruction and Plaintiffs provide no citation to the Record to support their opinion that one-to-one instruction was necessary.

The Student received small and large group instruction, as outlined in the IEP, and the glass doorway vestibule was used as a space to allow the Student to calm and neutralize his behaviors so that he could return to his general education classroom, not for one-to-one instruction. All of the Student's academic instruction followed the general education curriculum and was delivered and graded by his first grade general education teacher. The Student did not have difficulty with the first grade curriculum and testimony reflects that the was capable of handling first grade core academics. (Transcript at p. 2030.) While there is evidence that the aide would require the Student to complete fewer questions, sometimes while in the glass house, in an effort to ensure the Student understood the material, there is no evidence that the aide was creating or offering a different educational program to the Student. The evidence demonstrates the Student progressed on all of his IEP goals/objectives during first grade.

**Behavior:** Plaintiffs claim the 2009-10 IEP failed to properly address behaviors that interfered with his access to the curriculum and resulted in his failure to achieve

meaningful educational benefit for the 2009-10 school year.  Plaintiffs argue that the School District should have addressed the Student's interfering behaviors differently, given the information available from the 2008-09 school year,[21] and that there was no meaningful attempt by the IEP team to address the Student's escalating behaviors. Plaintiffs assert that the School District should have implemented "an appropriate positive reinforcement system" to address the Student's behaviors. Plaintiffs state, "There was no set system in place to work with [the Student] on his behaviors."

The School District completed a Functional Behavior Assessment ("FBA") early in the 2009-10 school year, adding Goal 8 to include sensory breaks when the Student perceived a task as challenging.  (Transcript at pp. 2072-2073; Joint Exhibit 46, 11/10/09 IEP Addendum.)  A second FBA was conducted in the spring of the 2009-10 school year, also to address the need for sensory breaks.  A second Addendum was drafted to include strategies for dealing with the behavior issues and to include accommodations for all goals, including the use of a quiet area and break area, the "glass house," outside of the general education setting.  The Student's first grade report card included mostly satisfactory and satisfactory plus grades, and he made adequate-to-exceptional progress on his yearly IEP goals and objectives.  There is no basis upon which to find that the 2009-10 IEP failed to properly address the Student's behavior.

In addition to the foregoing, Plaintiffs argue that School District failed to implement the 2009-10 IEP as written and that progress reports were, therefore, inaccurate and misleading, incorrectly reflecting the Student had mastered goals when he had not.  Plaintiffs assert that the Student was receiving special education services in the glass house, rather than in the general education classroom, and that the special education services deviated from what was prescribed under the IEP.  However, all testimony of Record indicates that the Student's education was provided as set forth in the IEP; that the glass house was used as a sensory or break area, as contemplated under the 2009-10 IEP; and, that the Student's curriculum, assignments, instruction and grading remained aligned with the general education curriculum and standards, regardless of whether some of the work had to be completed in the glass house.  The Student's curriculum was not modified, although modifications to how the work was completed were made as provided in

---

[21]
      This argument is curious because Plaintiffs state in their Complaint that the Student made adequate progress in the regular education classroom during Kindergarten, the 2008-09 school year, without any adverse behaviors that required removal from the classroom.  (Complaint at Paragraph 22.)

the IEP.

Further, there is no evidence to prove Plaintiffs' claim that the Student's progress reports were inaccurate.  Plaintiffs provide very little citation to the Record; mischaracterize some testimony; and, in the absence of evidence, the Court cannot substitute Plaintiffs' speculation. Testimony from those charged with the task of documenting the Student's progress indicated that the progress reports and report cards were indeed accurate.[22]  Further, school officials appear to have been unaware that the Parents were completing the Student's homework and, therefore, cannot be faulted if the documented progress was in fact due, in part, to the Parents' intervention, as suggested by Plaintiffs.

The 2009-10 IEP included all components mandated by law and was tailored to confer a meaningful educational benefit for the Student.  The documentation and testimony of Record indicates that the 2009-10 IEP was implemented as written and progress reports indicate the Student was making adequate-to-exceptional progress on most of his IEP goals and mastered some.  Plaintiffs have cited nothing in the Record to support a finding to the contrary. Accordingly, the decisions of the IHO and SLRO relative to the 2009-10 IEP must be upheld.

**B.      2011-12 IEP**

With regard to the 2011-12 IEP, Plaintiffs assert that the IEP failed to address the Student's "deficits in behaviors and academics as required by the Ohio Department of Education" and that the focus on behavioral goals was based on data "that might not have been relevant to [the student]."  Plaintiffs argue that the IEP goals did not provide the Student with the ability to access the general education curriculum and that the IEP provided no academic

---

[22]

Progress reports document behavior, whereas report cards document academic progress.  During the 2009-10 school year, the Student was not identified as having any academic deficiencies.  (School District's Response Brief at p. 33, citing the 2009-10 IEP and the Addendums thereto.)

standards and no curriculum instruction.

The School District gathered information from the Student's March 2011 ETR and from the STEPS and BIIO private placements during the 2010-11 school year for purposes of completing the 2011-12 IEP. The 2011-12 IEP was then developed to prioritize student behavior because, based on the evidence available, behavior impacted the Student's ability to access the general education curriculum. The record is clear that the Mother knew and agreed to the IEP, which prioritized addressing the Student's behaviors. An employee of the Educational Service Center, a branch of the Ohio Department of Education, testified that behavior must be prioritized prior to moving on to academics. (IHO Decision at p. 52.) The Parents offer no support for their claim that the failure to address specific academic areas in the 2011-12 IEP rendered the IEP insufficient, given the unique needs of the Student and the evidence gathered by the School District demonstrating a need to prioritize behavior. It should also be noted that while the Parents contend that the IEP did not sufficiently address core educational requirements, Mr. Frederick testified that while in the SCLC, the Student received the general education core content, with few modifications. (Transcript at pp. 2244-46 and 1148.)

At the beginning of the 2011-12 school year, on or around September 1, 2011, the Supervisor of Special Education, Bethany Britt, retained an outside consultant, Dr. Christine Reeve, a Board Certified Behavioral Analyst, PhD level, to conduct another FBA on the Student because of his prior behaviors at STEPS and BIIO. (Transcript at pp. 1561-62, 1567, 1592-1595, and 1601.) Dr. Reeve had behavioral data collected by intervention specialist Frederick and observed the Student on 9/9/11 and 10/7/11. Dr. Reeve believed the Student to be successful in Mr. Frederick's classroom; observed no significant behaviors and believed the IEP was adequate to address the Student's needs. (Transcript at pp. 1600-1617.) The Student was making adequate to exceptional progress on his IEP goals and his IEP was amended to include more time in the

general education classroom because his behaviors had improved, as recommended by Dr.

Reeve.  (Transcript at pp. 1615-16, 1635-37.)

Testimony from the Student's third grade general education teacher; case

manager/intervention specialist; aide; SLP; and, Occupational Therapist indicated that the

Student experienced limited behavior problems while still enrolled in the School District during

the fall of 2011.  In short, after the start of the 2011-12 school year, the Student appears to have

demonstrated less inappropriate behavior than had previously been observed.  The School

District acted proactively and swiftly at the beginning of the school year to assess the Student's

needs.[23]

Based on the evidence of record, the 2011-12 IEP contained all necessary components

and was tailored to confer a meaningful educational benefit, based upon the Student's unique

needs.   Accordingly, the decisions of the IHO and SLRO with regard to the 2011-12 IEP are

affirmed.

**IV.      OAC 3301-51-05(K)(14(b)(iii).**

---

[23]

In addition to the foregoing, Plaintiffs previously alleged that the District violated
Plaintiffs' right to a FAPE during the 2011-12 by failing to create a transition plan for the
Student in the fall of 2011, by which he would transition from the SCLC to the general
education classroom, once it was determined that his behavior had improved.  However,
there is no discussion regarding the same in their Motion.

The IHO found that the facts of this case did not support the need for a formal
transition plan.  The Student's 2011-12 IEP prioritized behavior based on the information
available to the School District, given the fact that the Student did not attend Strongsville
during the 2010-11 school year.  The Student was evaluated in early fall 2011, and
discussion followed regarding increasing the Student's time in the general education
classroom.  The evaluation was completed in mid-October 2011 and the Parents pulled
the Student from the School District in November 2011.  Simply put, there is no evidence
that a transition plan was needed when the school year began in August 2011 and the
School District appears to have had very little time to react to the updated behavioral
results and revise the Student's 2011-12 IEP before the Student was unilaterally removed
from the District by the Parents.

In their Second Cause of Action, Plaintiff assert that the SLRO failed to comply with OAC 3301-51-05(K)(14)(b)(iii); that the SLRO appears to have "rubber-stamped" the IHO's decision; and, that the SLRO's decision affirming the decision of the IHO was in error.  OAC 3301-51-05(K)(14(b)(iii) provides that the official conducting a review of the IHO's decision on appeal must (a) examine the entire hearing record; (b) ensure that the procedures at the hearing were consistent with the requirements of due process; (c) seek additional evidence, if necessary. . . . (d) afford the parties an opportunity for oral or written argument, or both, at the discretion of th reviewing official; (e) make an independent decision on completion of the review; and, (f) give a copy of the written, or, at the option of the parents, electronic findings of fact and decisions to the parties.

The decision of the SLRO reflects a thorough examination of all evidence of record in this case.  Each of Plaintiffs' Assignments of Error were adequately examined and addressed and there is simply nothing to substantiate Plaintiffs' claims that the SLRO failed to comply with the mandates of the OAC.

## V.      Requested Relief.

Plaintiffs seek tuition reimbursement for their unilateral placement of the Student outside of the School District at the Monarch School beginning in the fall of 2011.  Entitlement to tuition reimbursement depends first upon proof that the School District failed to make a FAPE available in a timely manner prior to enrollment.

All evidence of Record indicates the School District provided the Student with a FAPE in his LRE during the 2009-10 and 2011-12 school years.  Accordingly, the decisions of the IHO and SLRO denying Plaintiffs' request for tuition reimbursement must be affirmed.

## Conclusion

Plaintiffs have failed to prove that Defendant-Appellee, Strongsville City School District,

denied N.S. a FAPE for the 2009-10 and 2011-12 school years and have failed to prove that the SLRO failed to comply with Ohio law.  Plaintiffs made numerous claims of deficiencies in both process and content relative to the Student's 2009-10 and 2011-12 IEPs, yet cite very little testimony or mischaracterize testimony in support thereof.  In this case, the Record demonstrates the School District went to great lengths and expended significant resources to develop appropriate educational programs and services for the Student and that the School District worked diligently to include the Parents in the IEP process.  The School District complied with the mandates of the IDEA and Ohio law and the programs developed included all necessary components and were tailored to confer a meaningful educational benefit based on the Student's unique needs.

Based on the foregoing, Plaintiffs' Motion for Judgment on the Administrative Record (Docket #21) is DENIED.  The decisions of the IHO and SLRO are hereby AFFIRMED.  Costs to be borne by Plaintiffs.


IT IS SO ORDERED.
                                                          s/Donald C. Nugent                    
                                                         DONALD C. NUGENT
                                                         United States District Judge


DATED: May 30, 2014